## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

KURT NILSON AND REGINALDO CARIZOZA GUZMAN,
D/B/A KING KONG CUSTOM AUDIO AND ACCESSORIES, LLC,

     Plaintiffs,

v.                                                           **1:19-cv-00203-JB-SCY**

PEERLESS INDEMNITY INSURANCE COMPANY,

     Defendant.

## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT
## ON COUNT I OF THE COMPLAINT

In accordance with Fed.R.Civ.P. 56, Defendant Peerless Indemnity Insurance Company ("Peerless"), by and through its undersigned counsel, Allen Law Firm, LLC, moves the Court for Summary Judgment in its favor on the claims asserted by Plaintiffs, Kurt Nilson and Reginaldo Carizoza Guzman, d/b/a King Kong Custom Audio and Accessories, LLC ("Plaintiffs" or "King Kong") in their Complaint which was originally filed on February 7, 2019, in the Second Judicial District, County of Bernalillo, State of New Mexico. Defendant removed the matter to this Court on March 11, 2019 [Doc. 1].

Plaintiffs' Complaint asserts claims for Breach of Insurance Contract (Count I), Violation of Unfair Insurance Practices Act ("UIPA") (Count II), Violation of Unfair Trade Practices Act ("UTPA") (Count III), Breach of the Covenant of Good Faith and Fair Dealing (Count IV), Breach of Fiduciary Duty (Count V) and Constructive Fraud (Count VI) [Doc. 1-1, pp. 5-18 ("the Complaint")]. The present Motion addresses Count I of the Complaint. A separate Motion will be filed concurrently herewith on Counts II through VI.[1]

---

[1] In the interest of judicial economy, as well as for ease of reference, Peerless presents one set of Undisputed Material Facts in the present motion, upon which it will rely for both motions.

Pursuant to DNM LR-Civ. 7.1(a), Peerless sought concurrence from counsel for Plaintiffs in this Motion on March 5, 2020. Plaintiffs did not respond to the request at the time this Motion was filed.

## I. SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate when the pleadings, depositions, interrogatory answers, and admissions on file, together with any affidavits, "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). When applying this standard, a court must "view the evidence and draw reasonable inferences therefrom in the light most favorable to the nonmoving party." *Simms v. Oklahoma ex rel. Dep't of Mental Health & Substance Abuse Serv.*, 165 F.3d 1321, 1326 (10th Cir. 1999). A mere scintilla of evidence supporting the nonmoving party's theory does not create a genuine issue of material fact. *Anderson v. Coors Brewing Co.*, 181 F.3d 1171, 1175 (10th Cir. 1999). Instead, the nonmoving party must present facts such that under the applicable law, a reasonable jury could find in its favor. *Id.* Summary judgment is mandated, after adequate time for discovery and upon motion, "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be 'no genuine issue as to any material fact' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex, Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). There is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. *Anderson*, 477 U.S. at 248. There is no genuine issue for trial when the record taken as a whole could not lead a rational trier of fact to find for the nonmovant. *Matsushita Elec. Indus. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citation omitted).

When the moving party satisfies its initial burden, the party opposing the motion may not rest upon mere allegations or denials in the pleadings but must set forth specific facts showing there is a genuine issue for trial as to a dispositive matter for which it carries the burden of proof. *See Muñoz v. St. Mary-Corwin Hosp.,* 221 F.3d 1160, 1164 (10th Cir. 2000). Nor may the nonmovant rely upon counsel's contentions to defeat summary judgment. *Pueblo Neighborhood Health Centers., Inc. v. Losavio*, 847 F.2d 642, 649 (10th Cir. 1988). It is insufficient "to simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson,* 477 U.S. at 248. Interpreting insurance policies and determining policy rights and obligations "are questions of law, [and are] appropriate grist for the summary judgment mill." *Winters v. Charter Oak Fire Ins. Co*., 4 F.Supp.2d 1288, 1291 (D.N.M. 1998) (insurance policy construction is a matter of law that can be decided on summary judgment). When facts are undisputed and the only issue is the application of a policy, all that remains is a question of law for the court. *Benns v. Continental Cas., Co*., 982 F.2d 461, 462 (10th Cir. 1993).

## II. BACKGROUND AND SUMMARY OF ARGUMENT

This lawsuit stems from a dispute between Plaintiffs and Defendant arising out of fire damages sustained on June 20, 2014, at their commercial property located at 9999 Central Ave. in northeast Albuquerque. Peerless insured King Kong under a Businessowners policy ("the Policy"), which was in effect at the time of the fire. King Kong filed a claim related to the fire that same day and Peerless immediately began investigating the claim. Defendant made two $50,000 payments under the Business Personal Property ("BPP") coverage provision of the Policy on July 15 and October 3, 2014. A third payments was made on November 24, 2014, in the amount

of \$50,000--\$15,000 of which was paid under the Business Income Loss coverage portion of the Policy.  A final payment of \$87,714.44 was issued to King Kong on July 2, 2019.  King Kong contends that Defendant has failed to pay for covered expenses and damages it claims are covered by the Policy.  Specifically, with respect to its breach of contract claim, King Kong alleges that it is entitled to additional compensation for: 1) extra expenses, 2) debris removal, 3) accounts receivable, and 4) BPP coverage up to \$202,800.  The undisputed material facts presented below would not allow a rational trier of fact, taking the record as a whole, to find that King Kong breached the contract of insurance with Plaintiffs and summary judgment, therefore, is warranted in Peerless' favor on Count I of the Complaint.

### III.  UNDISPUTED MATERIAL FACTS

**A.**     **THE POLICY:**

1.       Peerless issued Businessowners' Policy No. BOP1037231 to King Kong Custom Auto and Accessories for the period between February 24, 2014 to February 24, 2015.  *See* pertinent portions of the Policy, attached hereto as **Exhibit A**.

2.       At the time of the fire on June 20, 2014, the applicable Commercial Protector Coverage Form Declarations and Businessowners Coverage Form Declarations, issued April 10, 2014, provided coverage for BPP with limits of \$202,800, subject to a \$500.00 deductible.  Exh. A, pp. 000038-000040.  The limits were subject to an automatic 4% annual increase.  *Id.*

3.       The Declarations also provided that "Business Income is included as an Additional Coverage not subject to the BPP limits."  *Id.*

4.       Relevant portions of the Policy are contained on Form 44-115 (06/04) and state:

> **COMMERCIAL PROTECTOR COVERAGE FORM**
> **(Businessowners Coverage Form)**

\*\*\*

4

**SECTION I – PROPERTY**

**A.    Coverage**

We will pay for direct physical loss of or damage to Covered Property at the premises described in the Declarations caused by or resulting from any Covered Cause of Loss.

    **1.    Covered Property**

    Covered Property includes Buildings as described under Paragraph **a.** below, Business Personal Property as described under Paragraph **b.** below, or both, depending on whether a Limit of Insurance is shown in the Declarations for that type of property.

        \*\*\*

        **b.**    **Business Personal Property** located in or on the buildings at the described premises or in the open (or in a vehicle) within 1,000 feet of the described premises, including:
        **(1)**    Property you own that is used in your business;
        **(2)**    Property of others that is in your care, custody or control, except as otherwise provided in Loss Payment Property Loss Condition Paragraph **E.6.d.(3)(b);**
        **(3)**    Tenant's improvements and betterments. Improvements and betterments are fixtures, alterations, installations or additions:
        **(a)**    Made a part of the building or structure you occupy but do not own; and
        **(b)**    You acquired or made at your expense but cannot legally remove[.]
        \*\*\*

    **5.    Additional Coverages**

    **a.    Debris Removal**

        **(1)**    **Subject to Paragraphs (3)** and **(4)**, we will pay your expense to remove debris of Covered Property caused by or resulting from a Covered Cause of Loss that occurs during the policy period. The expenses will be paid only if they are reported to us in writing within 180 days of the date of direct physical loss or damage.

\*\*\*

**f.**     **Business Income**

**(1)**     **Business Income**

**(a)**     We will pay for the actual loss of Business Income you sustain due to the necessary suspension of your "operations" during the "period of restoration". The suspension must be caused by direct physical loss of or damage to property at the described premises. The loss or damage must be caused by or result from a Covered Cause of Loss. With respect to loss of or damage to personal property in the open or personal property in a vehicle, the described premises include the area within 1,000 feet of the site at which the described premises are located.

\*\*\*

**(b)**     We will only pay for loss of Business Income that you sustain during the "period of restoration" and that occurs within 12 consecutive months after the date of direct physical loss or damage. We will only pay for ordinary payroll expenses for 60 days following the date of direct physical loss or damage, unless a greater number of days is shown in the Declarations.

**(c)**     Business Income means the:
**(i)**     Net Income (Net Profit or Loss before income taxes) that would have been earned or incurred if no physical loss or damage had occurred, but not including any Net Income that would likely have been earned as a result of an increase in the volume of business due to favorable business conditions caused by the impact of the Covered Cause of Loss on customers or on other businesses; and

**(ii)**     Continuing normal operating expenses incurred, including payroll.

**(d)**     Ordinary payroll expenses[.]

**g.    Extra Expense**

**(1)**    We will pay necessary Extra Expense you incur during the "period of restoration" that you would not have incurred if there had been no direct physical loss or damage to property at the described premises. The loss or damage must be caused by or result from a Covered Cause of Loss. With respect to loss of or damage to personal property in the open or personal property in a vehicle, the described premises include the area within 1,000 feet of the site at which the described premises are located.

\*\*\*

**(2)**    Extra Expense means expense incurred:
    **(a)**    To avoid or minimize the suspension of business and to continue "operations":
        **(i)**    At the described premises; or
        **(ii)**    At replacement premises or at temporary locations, including relocation expenses and costs to equip and operate the replacement or temporary locations.
    **(b)**    To minimize the suspension of business if you cannot continue "operations".
    **(c)**    To:

        **(i)**    Repair or replace any property[.]

        \*\*\*

**(3)**    With respect to the coverage provided in this Additional Coverage, suspension means:
    **(a)**    The partial slowdown or complete cessation of your business activities; and
    **(b)**    That a part or all of the described premises is rendered untenantable, if coverage for Business Income applies.
**(4)**    We will only pay for Extra Expense that occurs within 12 consecutive months after the date of direct physical loss or damage. This Additional Coverage is not subject to the Limits of Insurance of

**SECTION I - PROPERTY**.

\*\*\*

### 6.     Coverage Extensions

In addition to the Limits of Insurance of **SECTION I – PROPERTY**, you may extend the insurance provided by this policy as provided below.

\*\*\*

#### d.     Personal Effects
You may extend the insurance that applies to Business Personal Property to apply to personal effects owned by you, your officers, your partners or "members", your "managers" or your employees. This extension does not apply to:
(1)     Tools or equipment used in your business; or
(2)     Loss or damage by theft.

The most we will pay for loss or damage under this Extension is $2,500 at each described premises.

\*\*\*

#### f.     Accounts Receivable

(1)     You may extend the insurance that applies to Business Personal Property to apply to accounts receivable. We will pay:
(a)     All amounts due from your customers that you are unable to collect […],

that result from direct physical loss or damage by any Covered Cause of Loss to your records of accounts receivable.

\*\*\*

\*\*\*

## C.     Limits Of Insurance

\*\*\*

### 4.     Automatic Increase

#### b.     Business Personal Property Limit

      (1)     The Limit of Insurance for Business Personal Property will automatically increase by the annual percentage shown in the Declarations.

            \*\*\*

**E.**      **Property Loss Conditions**

    \*\*\*

    **3.**      **Duties In The Event Of Loss Or Damage**

        **a.**     You must see that the following are done in the event of loss or damage to Covered Property:

           \*\*\*

           (4)     Take all reasonable steps to protect the Covered Property from further damage, and keep a record of your expenses necessary to protect the Covered Property, for consideration in the settlement of the claim. This will not increase the Limit of Insurance of **SECTION I - PROPERTY**. However, we will not pay for any subsequent loss or damage resulting from a cause of loss that is not a Covered Cause of Loss. Also, if feasible, set the damaged property aside and in the best possible order for examination.

           (5)     At our request, give us complete inventories of the damaged and undamaged property. Include quantities, costs, values and amount of loss claimed.

           \*\*\*

           (7)     Send us a signed, sworn proof of loss containing the information we request to investigate the claim. You must do this within 60 days after our request. We will supply you with the necessary forms.

           (8)     Cooperate with us in the investigation or settlement of the claim.

           \*\*\*

   \*\*\*

    **6.**      **Loss Payment**

    In the event of loss or damage covered by this policy:

        **a.**     At our option, we will either:

**(1)** Pay the value of lost or damaged property;

**(2)** Pay the cost of repairing or replacing the lost or damaged property;

**(3)** Take all or any part of the property at an agreed or appraised value; or

**(4)** Repair, rebuild or replace the property with other property of like kind and quality.

**b.** We will give notice of our intentions within 30 days after we receive the sworn proof of loss.

**c.** We will not pay you more than your financial interest in the Covered Property.

**d.** Except as provided in Paragraphs **(2)** through **(8)** below, we will determine the value of Covered Property as follows:

**(1)** At replacement cost without deduction for depreciation, subject to the following:

**(a)** You may make a claim for loss or damage covered by this insurance on an actual cash value basis instead of on a replacement cost basis. In the event you elect to have loss or damage settled on an actual cash value basis, you may still make a claim on a replacement cost basis if you notify us of your intent to do so within 180 days after the loss or damage.

**(b)** We will not pay on a replacement cost basis for any loss or damage:

**(i)** Until the lost or damaged property is actually repaired or replaced; and

**(ii)** Unless the repairs or replacement are made as soon as reasonably possible after the loss or damage.

**\*\*\***

**\*\*\***

**(3)** The following property at actual cash value:

**(a)** Used or second-hand merchandise held in storage or for sale;

**(b)** Property of others. However, if an item(s) of personal property of others is subject to a

written contract which governs your liability for loss or damage to that item(s), then valuation of that item(s) will be based on the amount for which you are liable under such contract, but not to exceed the lesser of the replacement cost of the property or the applicable Limit of Insurance;

\*\*\*

e.     Our payment for loss of or damage to personal property of others will only be for the account of the owners of the property. We may adjust losses with the owners of lost or damaged property if other than you. If we pay the owners, such payments will satisfy your claims against us for the owners' property. We will not pay the owners more than their financial interest in the Covered Property.

\*\*\*

**THE LOSS:**

5.     King Kong suffered a fire loss at its business on **June 20, 2014**, and a claim was opened that same day.  *See* King Kong Claim File pp. 000026-000027, 000037 and 000043, pertinent portions are attached hereto as **Exhibit B**.

6.     It was determined after an inspection on **June 23, 2014**, that the fire started in the woodworking shop in a dust collector.  Exh. B, p. 000024.  Peerless concluded that there was no recourse or subrogation available to Peerless, because "the insured would have been responsible for maintaining the machine and bag."  Exh. B, p. 000023.

7.     Greer & Kirby was hired by Peerless on **June 24, 2014**, to perform a "salvage assignment" and to complete an on-site inventory of the premises.  Exh. B, pp. 000023, 000083-000084, and 000160.

8.     Mr. Terry Dark, an independent adjuster with Santa Fe Adjustment Company hired by Peerless, met with Mr. Nilson on or about **June 25, 2014**.  Exh. B, p. 000163.

9.      Mr. Shatto, the adjuster with Peerless, sent a referral to the Loss Audit Department ("Loss Audit") on **June 26, 2014** to address the Business Income loss claim ("BI Loss").  Exh. B, 000022.

10.      Mr. Rich Lien of Greer & Kirby met with Mr. Nilson on Monday, **June 30, 2014** to do the on-site inventory.  Exh. B, pp. 000168, 000170 and 000912-000913.

11.      Brian Bukoskey of the Loss Audit Department called Mr. Nilson to discuss the BI Loss claim on **June 30, 2014**.  Exh. B, p. 000021.

12.      Mr. Bukoskey sent Mr. Nilson an e-mail on **July 2, 2014**, requesting tax returns, monthly profit and loss statements, daily sales reports, and payroll documents (generally referred to herein as "financial documents").  Exh. B, p. 002089.

13.      By **July 2, 2014**, Mr. Shatto had spoken with Mr. Nilson on numerous occasions. Exh. B, p. 000021.  In those conversations, Mr. Shatto advised Mr. Nilson that Loss Audit would need "tax returns and profit and loss statements" and asked Mr. Nilson provide information regarding rent and costs incurred in establishing a temporary location for the business. *Id.*

14.      On **July 2, 2014**, Peerless received the initial report from Mr. Lien, which Mr. Lien indicated was missing information that had been requested from Mr. Nilson regarding pricing of the inventory listed in the report.  Exh. B, pp. 000021 and 000249-000270.

15.      That same day, Mr. Lien sent the inventory list directly to Mr. Nilson and specifically requested that he review the estimates to ensure accuracy and to provide him information for value/pricing of the items that contained blanks.  Exh. B, pp. 000231-000248.

16.      Mr. Lien advised Mr. Shatto on **July 9, 2014**, that he received information from King Kong but was still missing receipts and other documentation to prove values on the higher

priced items. Exh. B, p. 000297. Mr. Lien further advised that Mr. Nilson added "a fairly large quantity of items that [he] never saw when [he] was there."

17.     An updated inventory was provided by Mr. Lien to Mr. Shattto on **July 9, 2014**. Exh. B, pp. 000298-000335. The total BPP loss calculated for the items identified in the original inventory was $138,540.77. *Id.*, p. 000320.

18.     Mr. Bukoskey contacted Mr. Nilson via e-mail on **July 10, 2014**, advising he still needed the information previously requested on July 2, 2014. Exh. B, pp. 002088-002089.

19.     On **July 10, 2014**, Mr. Shatto contacted Mr. Nilson and provided him with a Sworn Statement for Advance Payment. Mr. Shatto advised Mr. Nilson:

> According to Rich Lien with Greer & Kirby there are many items that can be cleaned for re-use. You and/or your employees can clean these items and keep track of the labor time. We can add that to your claim for the loss to business personal property. You can also contact a local restoration company to provide a proposal for cleaning and restoring the salvageable property. Please send me a copy of any proposals that you receive from a restoration company.

> Please notate on the list prepared by Rich the ownership on the items, whether the owner is King Kong, customers or employees. Also notate the property that you think can be cleaned/restored for re-use in your operations.

> Please send me an inventory of the additional items that are not on the list that we just discussed during the phone conversation. Please include the property that could be considered tenant improvements, such as the paint booth and lifts. Your business personal property coverage includes improvements that you have made to the building.

> The lease agreement with your landlord does indicate that the ownership of the improvements immediately vests with the landlord.

> Please send me a copy of the proposed lease agreement on the temporary location. Also, please advise the anticipated cost of any modifications, including equipment set up, that will be necessary for you to resume operations within the temporary location.

> Please send me copies of the invoices for the tents that you purchased so your employees could work in the parking lot. Send any other receipts that you have for expenses incurred to minimize the suspension of operations.

Exh. B, p. 000754.

20.    On **July 15, 2014**, Mr. Shatto asked Mr. Lien to return to the site of the loss to address items Mr. Nilson was claiming were missed and verify quantities and values.  Exh. B, p 000816.

21.    On **July 15, 2014**, Peerless advanced King Kong $50,000 under the BPP coverage portion of the Policy.  Exh. B, pp. 000021, 000428 and 001293.

22.    On **July 21, 2014**, Mr. Lien met with Mr. Nilson for a second inventory.  Exh. B, p. 000912.

23.    On **July 22, 2014**, Mr. Lien provided Mr. Shatto with an updated report, which included a current working copy of the inventory based on his second visit to the site of the loss. Exh. B, pp. 000019, 000881-000911.  Mr. Lien indicated that the numbers were not yet complete, because he was still waiting information, he had previously requested from King Kong.  *Id.*

24.    Mr. Lien e-mailed King Kong on **August 5, 2014**, requesting they provide the information he had previously requested.  Exh. B, pp. 000953-000954.

25.    On **August 19, 2014,** Mr. Shatto followed-up with Mr. Nilson requesting additional information for the items on the inventory, including ownership and age of each item, original receipts and invoices related to costs incurred related to operating out of the temporary location. Exh. B, p. 000987.

26.    On **August 20, 2014**, Mr. Bukoskey sent Mr. Nilson an e-mail asking him to provide financial documents needed to substantiate his BI Loss claim.  Exh. B, pp. 002086-002087.

27.    On **September 3, 2014**, Mr. Shatto e-mailed Mr. Nilson asking for a status on the information he requested in his August 19, 2014 e-mail.  Exh. B, p. 001166.

14

28.    On **September 17, 2014**, Mr. Bukoskey sent Mr. Nilson an e-mail requesting the financial documents he previously requested.  Exh. B, p. 002086.

29.    Mr. Lien updated the inventory list with information provided to him by Mr. Nilson on **September 15, 2014**.  Exh. B, pp. 001253-001289.

30.    Mr. Shatto updated the Loss Schedule on **October 3, 2014**, to reflect the numbers provided by Mr. Lien, which showed BPP losses of $135,888.95.  Exh B, p. 001290.

31.    Mr. Shatto wrote to Mr. Nilson on **October 3, 2014** advising that he issued another advance for $50,000.00.  Exh. B, pp. 000017, 001241 and 001293.  He explained that King Kong could recover replacement cost value and asked that Mr. Nilson provide receipts showing any items that had been replaced.  *Id.*

32.    Mr. Bukoskey requested the financial documents again on **October 15, 2014**.  Exh. B, p. 002085.

33.    On **October 31, 2014**, Mr. Shatto offered to settle the BPP on an actual cash value basis for $135,000.  Exh. B, p. 001320.  He again reminded him that he could recover the replacement cost value if receipts were submitted as required by the Policy.  *Id.*

34.    On **November 24, 2014**, Peerless issued a third advance of $50,000, consisting of $35,000 for BPP and $15,000 for BI Loss.  Exh. B, p. 000015.

35.    Mr. Bukoskey requested the financial documents again on **November 11** and **December 9, 2014,** and **January 5**, **January 21**, and **February 17, 2015**.  Exh. B, pp. 002082-002084.

36.    On **March 11, 2015**, Mr. Shatto sent a letter advising Mr. Nilson that Peerless advanced $150,000 on King Kong's claim which included $135,000 BPP and $15,000 for BI Loss.  Exh. B, pp. 001374-001378.  He again explained the Policy requirements regarding replacement

cost coverage and informed him the BPP coverage limits were $202,800 plus the automatic 4% increase of $2,578. *Id.* Mr. Shatto advised that based on the Greer & Kirby inventory, the BPP claim was $263,992.47, including $3,445.97 for debris removal. *Id.* The actual cash value for the loss was $133,719.22. *Id.* Mr. Shatto cited various applicable provisions of the Policy, including loss payment conditions, coverage for replacement cost value, debris removal, personal effects, business income and extra expense.

37.     Mr. Bukoskey requested the financial documents again on **March 18, April 14,** and **May 14, 2015**. Exh. B, pp. 002081-002082.

38.     On **May 27, 2015**, Mr. Shatto contacted King Kong via e-mail, asking about the debris removal. Exh. B, p. 001394. He advised that the invoice would be added the claim settlement once it had been paid and asked for invoices to support replacement costs. *Id.*

39.     Mr. Bukoskey requested the financial documents again on **June 11** and **June 22, 2015**. Exh. B, p. 002080.

40.     On **June 23, 2015**, Mr. Nilson faxed three sets of documents, consisting of invoices and receipts, to Mr. Shatto. Exh. B, pp. 001418-001462, 001463-001498, and 001499 to 001530.

41.     Mr. Bukoskey requested the financial documents again on **June 30,** and **July 20, 2015**. Exh. B, p. 002079.

42.     In an e-mail dated **August 17, 2015**, Mr. Shatto advised Mr. Nilson that he could not decipher from the faxed documents whether the receipts submitted reflected the expense incurred in replacing the property, that some of the receipts were not legible, that some of the receipts did not provide sufficient detail to identify which category of coverage the receipts related to and that a number of receipts appeared to relate to a specific job as opposed to the replacement of property that was in the building at the time of the loss. Exh. B, p. 001540. Mr. Shatto further

advised that receipts totaled approximately $25,000 and Peerless has already advanced payments in the amount of $135,000. *Id.* Finally, Mr. Shatto stated that he was still awaiting, over one year after the loss, the financial documents. *Id*. He requested that the information be provided within 30 days. *Id.*

43.     In an e-mail dated **August 17, 2015** to Mr. Nilson, Mr. Brian Bukoskey requested the financial documents. Exh. B, p. 002078.

44.     On **September 15, 2015**, Mr. Bukoskey called Mr. Nilson and left him a message, and he sent a follow up e-mail requesting the financial documents again and identifying the documents that had been requested but not produced. Exh. B, p. 002078.

45.     On **September 29, 2015**, Mr. Shatto sent a "twenty-day letter" advising Mr. Nilson that the claim would be closed if a response was not received by October 27, 2015. Exh. B, pp. 001700, and 001849-001853. The letter reiterated the contents of his March 11, 2015, letter described in ¶ 36 above. *Id*.

46.     On **October 13, 2015**, Mr. Bukoskey spoke with Mr. Nilson on the telephone and followed up with an e-mail requesting a status of the records he had requested to support the BI loss claim. Exh. B, p. 002077.

47.     On **November 2, 2015**, Mr. Shatto closed the file. Exh. B, pp. 000011 and 001862-001865.

48.     On **November 9, 2015**, Mr. Bukoskey e-mailed Mr. Nilson asking whether he was going to be sending the documents to support his BI loss claim. Exh. B, p. 002077.

49.     On **July 20, 2016**, Mr. Nilson requested that the claim be reopened. Exh. B, pp. 001874-001877.

50.     Mr. Bukoskey responded to Mr. Nilson that same day identifying various documents that had still not been provided.  Exh. B, p. 001875.

51.     Mr. Shatto also responded to Mr. Nilson in an e-mail on **July 20, 2016**, attaching the letter he previously sent to King Kong outlining the Policy provisions and explaining what additional documentation was needed to finalize the claim.  Exh. B, p. 002415  He asked that Mr. Nilson explain why he had not responded to Peerless's prior requests for information and to provide the information Peerless had been requesting since the date of the fire.  *Id.*

52.     On **August 8, 2016**, Mr. Shatto reopened the claim.  Exh. B, pp. 002412-002413.

53.     On **August 10, 2016**, Mr. Bukoskey advised Mr. Nilson that he still needed the payroll from June 29, 2014 to July 12, 2014, as well as the tax returns for 2015.  Exh. B, p. 002428.

54.     On **August 22, 2016**, Mr. Bukoskey sent Mr. Nilson an e-mail advising that he still needed the 2015 tax returns for King Kong.  Exh. B, p. 0002430.

55.     On **September 14 ,2016**, Mr. Shatto asked Mr. Nilson for an update on the status of receipt of the 2015 tax return.  Exh. B, p. 002561.

56.     On **September 15, 2016**, Mr. Nilson finally sent the 2015 tax returns.  Exh. B, pp. 002463-002465.

57.     On **September 30, 2016**, Mr. Shatto e-mailed Mr. Nilson a copy of Peerless's evaluation of the BI Loss claim.  Exh. B, pp. 002463-002483

58.     On **October 4, 2016**, Mr. Shatto e-mailed Mr. Nilson a letter identifying the provisions in the Policy applicable to the BI loss and explaining how the number was reached, stating

> We have received some receipts that are reported to show the expense incurred to replace business personal property. Some of the receipts are not legible, others do not show sufficient detail to identify the type of property. A number of the receipts appear to relate to a specific job as opposed to the replacement of property damaged

by the fire. The receipts we can verify to show the incurred expense to replace fire damaged property total approximately $25,000. Again, we have advanced $135,000 for the loss of business personal property. Please send us any additional invoices that you may have demonstrating the expense incurred in replacing fire damaged business personal property. We attached a copy of the invoices we have received to our 8/17/2015 email which show which are not legible. Please send us legible copies. Please notate the type of property that was purchased when it is not clearly shown on the invoice.

Exh. B, pp. 002615-002620.

59.    On **October 5, 2016**, Mr. Shatto sent Mr. Nilson an e-mail with an attached letter

addressing the BI Loss evaluation, explaining the provision in the Policy providing extra expense

coverage and stating:

> We have discussed in the past the need for you to send us the receipts for the incurred cost of the temporary location, that is covered by extra expense and is not part of our evaluation of the loss of income.
>
> We also need any invoices or receipts for the expense incurred to relocate to the temporary location. I think you indicated that you rented tents to continue operations in the parking lot at the loss location. Send those receipts as well.
>
> You also mentioned increased travel expenses related to having to operate at both the primary and temporary location. Send me documentation that shows those incurred expenses.
>
> I mentioned in the letter that it might be beneficial for you to share our measurement of the business income loss with your accountant. We would be happy to discuss our measurement with you and your accountant.

Exh. B, p. 002608.

60.    On or about **October 26, 2016**, Mr. Bukoskey spoke with Mr. Nilson regarding the

disagreement over the value of the BI Loss claim. Exh. B, p. 003066. Mr. Bukoskey advised Mr.

Nilson that if he did not agree with the calculations, to provide him with what Mr. Nilson is

claiming and the documentation to support those number. *Id.* He stated that he would be happy

to review that information. *Id.*

61.    On **May 8, 2017**, Mr. Shatto attempted to set up a conference call with Mr. Nilson and his accountant to discuss the BI Loss Claim, but Mr. Nilson failed to provide information on his accountant's availability.  Exh. B, p. 000008.

62.    Between **October 30** and **December 11, 2017**, Mr. Shatto and Mr. Nilson discussed meeting to review documentation to support King Kong's claim.  Exh. B, pp. 002621-002622, 002624, 002654.

63.    On **November 13, 2018**, King Kong requested a copy of the Policy and a meeting in person.  Exh. B, p. 000005.

64.    On **November 28, 2018**, a copy of the Policy was provided to Mr. Nilson.  Exh. B, pp. 000004 and 003604.

65.    An in-person meeting was held with Mr. Shatto, Mr. Nilson and Mr. Dotson on **December 13, 2018**.  Exh. B, p. 003816.

66.    On **December 17, 2018**, Mr. Nilson sent additional documents to Mr. Shatto.  Exh. B, p. 003833.

67.    On **January 24, 2019**, Mr. Shatto advised Mr. Nilson that he had reviewed the documents Mr. Nilson provided him at the December 2018 meeting.  Exh. B, p. 004111.  He indicated that he was "able to associate a majority of the invoices to replacement of business personal property." *Id.*  He asked, however, for additional information on specific receipts attached to his e-mail.  *Id.*

68.    Mr. Nilson responded on **January 28, 2019,** but did not provide any additional information relating to the attachment Mr. Shatto sent him.  Exh. B, p. 004444.

69.    Peerless received notice of the lawsuit on **February 7, 2019**.  Exh. B, p. 004448.

70.     Peerless continued to evaluate the claim and on **June 12, 2019**, determined that BPP losses in the amount of $207,553.75, BI in the amount of $27,027.00, Extra Expense in the amount of $2,071.80, and Coverage Extension in the amount of $3,237.58 had been substantiated. *See* **Exhibit C**.   Having valued the total claim at $239,890.13, final pay payment was made to King Kong for $87,714.44.  *See* **Exhibit D**.

## IV.  ARGUMENT AND AUTHORITIES

### A.     PLAINTIFFS' BREACH OF CONTRACT CLAIM (COUNT I) FAILS, BECAUSE PEERLESS HAS PAID ALL COVERAGES WHICH WERE SUBSTANTIATED BY KING KONG'S RECEIPTS, INVOICES AND FINANCIAL DOCUMENTS.

Plaintiffs allege that Peerless breached the Policy with regard to its failure to pay (1) extra expense, (2) debris removal, (3) accounts receivable and (4) BPP coverage up to $202,800.[2]  *See* Compl., Doc 1-1, ¶ 28(a) – 28(d).[3]

The Policy provides that Peerless will pay for "direct physical loss of or damage to Covered Property at the premises described in the Declarations caused by or resulting from any Covered Cause of Loss."  *See* Fact No. 4.[4]  The Property Loss Conditions, contained at § I(E)(3) of the Policy, provide that the insured "must":  (1) at Peerless's request, give a complete inventory of the damaged and undamaged property, including quantities, costs, values and amount of loss claimed; (2) send a signed sworn proof of loss containing the information requested needed to investigate

---

[2]  The Policy also included a 4% automatic annual increase, which raised the coverage applicable to this fire loss by $2,578.  *See* Fact No. 36.

[3]  To the extent Plaintiffs claim there was a breach of contract based on additional allegations in their Complaint that Peerless:  (1) failed to "promptly investigate, respond to Plaintiffs' communication, negotiate and pay reasonable sums" for their covered claims; (2) delayed the investigation by hiring multiple fire investigators to try and escape liability; and (3) delayed the investigation of the proof of loss claim forms and documents submitted by Plaintiffs," Doc. 1-1, ¶¶ 31-33, those allegations are not supported by the terms and conditions contained in the Policy.  These allegations, rather, sound in bad faith, not breach of contract.  The validity of Plaintiffs' claims related to alleged delays in the investigation and payments made on the claim are addressed in Peerless's Motion for Summary Judgment on Counts II-VI of the Complaint, filed concurrently herewith.

[4]  Peerless does not dispute that the fire loss was a "Covered Cause of Loss."

the claim; and (3) cooperate with Peerless in its investigation and settlement of the claim.  *Id.* ("Duties in the Event of Loss or Damage").  The Loss Payable provisions contained in § Section I(E)(6) of the Policy provide that at Peerless's option, it may pay the value of the damaged property, pay the cost of repairing or replacing the damaged property, or replace the property with other property of like kind and quality.  *Id.* ("Loss Payment').  The Loss Payment provisions provided "replacement cost" coverage, which would allow the insured to recover what it would cost to replace an item that was damaged in the fire, versus the item's "actual cash value," but only if the damaged property was actually replaced and only if the replacement was made "as soon as reasonably possible after the loss or damage."  *Id.*

An insurance policy is a contract between the insurer and the insured.  *See, e.g., Modisette v. Found. Reserve Ins. Co.*, 1967-NMSC-094, ¶ 14, 77 N.M. 661, 427 P.2d 21.  Thus, an insurer "may breach a contract by failing to perform a contractual obligation when that performance is called for [...] or announcing ahead of time that [it] will not perform a contractual obligation when the time for that performance comes due."  N.M. UJI–Civil § 13-822.  "The obligation of an insurer is a matter of contract law and must be determined by the terms of the insurance policy."  *Miller v. Triad Adoption and Counseling Services, Inc*., 2003-NMCA-055, ¶ 8, 133 N.M. 544, 65 P.3d 1099, citing *Knowles v. United Servs. Auto. Ass'n,* 1992-NMSC-030, ¶ 9, 113 N.M. 703, 832 P.2d 394.  "An insurance contract should be construed as a complete and harmonious instrument designed to accomplish a reasonable end."  *Id.*  "It is well settled that, absent a statute to the contrary, insurance contracts are construed by the same principles which govern the interpretation of all contracts."  *Rummel v. Lexington Ins. Co.*, 1997-NMSC-041, ¶ 18, 123 N.M. 752, 945 P.2d 970 (citation and quotation omitted).  A court must "consider the plain language of the relevant provisions, giving meaning and significance to each word or phrase within the context of the entire

contract, as objective evidence of the parties' mutual expression of assent." *United Nuclear Corp. v. Allstate Ins. Co.*, 2011-NMCA-039, ¶ 11, 149 N.M. 574, 252 P.3d 798 (internal quotation marks omitted). "[U]nambiguous insurance contracts must be construed in their usual and ordinary sense, unless the language of the policy requires something different." *Western Commerce Bank v. Reliance Ins. Co.,* 1987-NMSC-009, ¶ 8, 105 N.M. 346, 732 P.2d 873 (citations omitted). Policies that are not ambiguous and do not contravene public policy must be enforced as written. *Security Mut. Cas. Co. v. O'Brien*, 1983-NMSC-035, ¶ 8, 99 N.M. 638, 662 P.2d 639. "Any ambiguity in the insurance policy will be construed against the insurer so as to resolve any coverage issue in favor of the insured." *Ponder v. State Farm Mut. Auto. Ins. Co.*, 2000-NMSC-033, ¶ 25, 129 N.M. 698, 12 P.3d 960 (internal quotation marks omitted). "[A]n ambiguity does not exist merely because the parties disagree as to the meaning of a particular word" or on the construction to be given to the contract. *Slack v. Robinson*, 2003-NMC-083, ¶ 7, 134 N.M. 6, 71 P.3d 514. When language contained in a policy is unambiguous, New Mexico courts "will not strain the words to encompass meanings they do not clearly express." *Gonzales v. Allstate,* 1996-NMSC-041, ¶ 16, 122 N.M. 137, 921 P.2d 944 (citations omitted). Finally, "[a]bsent ambiguity, provisions of [an insurance] contract need only be applied, rather than construed or interpreted." *Richardson v. Farmers Ins. Co. of Ariz.*, 1991-NMSC-052, ¶ 5, 112 N.M. 73, 811 P.2d 571. Whether an ambiguity exists is a matter of law to be decided by the Court. *Id.*

### 1. Peerless paid the Policy limits for Business Personal Property Coverage and, thus, there was no breach of the Policy with respect to BPP coverage.

There was no breach of contract with regard to BPP coverage, because Peerless paid the Policy limits for such coverage. *See* Fact Nos. 2 and 70. Plaintiffs received payments from Peerless totaling $239,890.13. *See* Fact No. 70. Of that amount, $207,553.75 was paid to King Kong for BPP coverage, even though the Policy limit for such coverage was $205,378. *Id.*

23

Peerless hired Greer & Kirby on June 24, 2014.  *See* Fact No. 7.  Mr. Lien of Greer & Kirby met with Mr. Nilson on June 30, 2014, and compiled an original inventory.  *See* Fact No. 10.  Multiple requests from Mr. Shatto and Mr. Lien to King Kong for more information and documents necessary to support the BPP claim went ignored for several months.  *See* Fact Nos. 14, 15, 16, 19, 23, 24, 25, and 27.  Despite the fact the inventory was incomplete, Peerless advanced $50,000 to King Kong on July 15, 2014.  *See* Fact No. 21.

Mr. Lien completed an inventory on September 15, 2014, after finally receiving information from Mr. Nilson.  *See* Fact No. 29.  Based on the updated inventory, the BPP loss was valued at $135,888.95, and Mr. Shatto promptly issued a second payment under the BPP coverage to King Kong for $50,000.00 on October 3, 2014.  *See* Fact Nos. 30 and 31.  Mr. Shatto advised Mr. Nilson on October 3 and again on October 31, 2014, that the Policy included replacement cost value, which would allow King Kong to recover replacement costs once receipts were submitted showing the that the replacement item was purchased.  *See* Fact Nos. 31 and 33.  Having received no additional documentation from King Kong, Mr. Shatto paid the remaining $35,000 of the substantiated BPP claim to King Kong on November 24, 2014, along with a $15,000 advance on the BI loss claim.  *See* Fact No. 34.

Mr. Shatto communicated with Mr. Nilson on March 11 and May 27, 2015, asking for documents to support additional BPP coverage, including replacement costs, debris removal and extra expenses.  *See* Fact Nos. 36 and 38.  Although Mr. Nilson eventually sent some receipts on June 23, 2015, there was no information provided to Mr. Shatto to indicate what the receipts were for.  *See* Fact Nos. 40 and 42.  When Mr. Nilson failed to respond to Mr. Shatto's August 17, 2015 request that Mr. Nilson explain how the receipts he submitted were related to the claim and to

respond to another request from Mr. Shatto for additional information on September 29, 2015, the claim file was closed.  *See* Fact No. 45.

It was not until after meeting with Mr. Nilson in December 2018, that Mr. Shatto was provided the additional documentation he had been requesting since June 2014.  *See* Fact No. 67. Mr. Shatto was able to identify documents to support an additional payment under the Policy and the full limits of the BPP coverage under the Policy were issued to Plaintiff on July 2, 2019.  *See* Fact No. 70.  The Policy specifically provides that the insured must keep a record of expenses, give a complete inventory, including quantities, costs, values and amounts, and provide information requested by Peerless to investigate the claim.  *See* Fact No. 4.  The undisputed facts demonstrate that Plaintiffs failed to cooperate and ignored repeated requests that King Kong provide information sufficient to support additional payments under the Policy.    Moreover, Peerless paid full BPP limits under the Policy.  It had no contractual duty to pay more than what the insured could substantiate by receipts, invoices and other requested documentation.  There was no breach of the contract with regard to BPP coverage.

> **2.    Plaintiffs' accounts receivables documents were not damaged in the fire, therefore, Peerless did not breach the insurance contract by refusing to pay under the Accounts Receivable Coverage Extension.**

Plaintiffs claim they are entitled to coverage under Section I(A)(6)(f) of the Commercial Protector Coverage Form for "Accounts Receivables."  The Policy issued to King Kong, however, was not a credit insurance policy.  Instead, the Policy clearly provides coverage only for the accounts receivable records themselves—and does not extend to bad debts in general.  The Policy specifically states coverage will be provided for "amounts due from your customers that you are unable to collect […] that ***result from direct physical loss or damage*** by any Covered Cause of Loss ***to your records*** of accounts receivable."  *See* Fact No. 4.  Here, there is no dispute that

Plaintiffs' accounts receivable records and documents were not damaged in the fire. Because the actual accounts receivable documents were not damaged, there is no coverage under the Policy. Peerless did not breach the insurance contract by denying payment for that part of King Kong's claim.

       3.      **Peerless paid Plaintiff Extra Expense and Debris Removal benefits under the Policy and there has been no breach of contract.**

Peerless paid King Kong $2,071.80 for Extra Expenses and $3,237.58 for Coverage Extensions, which included reimbursement for the debris removal. *See* Fact No. 70. These amounts were paid only after Mr. Shatto was able to verify in June of 2019 the receipts and documentation supporting these amounts. During the course of handling the claim, Peerless asked repeatedly for documents supporting extra expenses and debris removal. *See* Fact Nos. 13, 19, 25, 36, 38, 51, and 59. Once documentation was provided by King Kong in December 2018, the amounts were paid. *See* Fact No. 70. There was no breach of contract with regard to payment of under the provisions relating to extra expenses and debris removal.

## CONCLUSION

Mr. Shatto advanced one $50,000 payment for BPP prior to the inventory being completed. Two additional $50,000 payments were made within a short period of time of Mr. Shatto receiving the documents supporting such additional payments. The final payment was made following the December 2018 meeting in which additional documentation was provided to justify additional payments being made under the Policy. No reasonable jury could find that Peerless breached its contract of insurance with King Kong under the undisputed facts presented in this case and Count I of Plaintiffs' Complaint should, therefore, be dismissed.

WHEREFORE, Defendant Peerless Indemnity Insurance Company respectfully requests that this Court grant summary judgment in its favor and dismiss Count I (Breach of Contract) for the reasons set forth herein and for any other reasons this Court may deem just and proper.

Respectfully Submitted,

**ALLEN LAW FIRM, LLC**

/s/ Meena H. Allen
MEENA H. ALLEN
KERRI L. ALLENSWORTH
6121 Indian School Road NE., Suite 240
Albuquerque, NM 87110

## CERTIFICATE OF SERVICE

I hereby certify that on this 6th day of March, 2020, I filed the foregoing electronically through the CM/ECF system, which caused the following parties or counsel to be served by electronic means, as more fully reflected on the Notice of Electronic Filing:

David L. Dotson
P.O. Box 115
Socorro, NM 87801

/s/Meena H. Allen
Meena H. Allen