## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

KURT NILSON AND REGINALDO
CARIZOZA GUZMAN, d/b/a KING
KONG CUSTOM AUDIO AND
ACCESSORIES, LLC,

            Plaintiffs,

vs.                                                                                    No. CIV 19-0203 JB\SCY

PEERLESS INDEMNITY INSURANCE
COMPANY,

            Defendant.

## <u>MEMORANDUM OPINION AND ORDER</u>

**THIS MATTER** comes before the Court on the Motion for Summary Judgment on Count

I of the Complaint, filed March 6, 2020 (Doc. 46)("First MSJ"), and the Opposed Motion for

Summary Judgment on Counts II through VI of the Complaint, filed March 6, 2020

(Doc. 47)("Second MSJ"). The primary issues are whether the Court should grant the First MSJ

and the Second MSJ, because: (i) Peerless Indemnity breached its insurance policy ("Policy") with

Plaintiffs Kurt Nilson and Reginaldo Carizoza Guzman, doing business together as King Kong

Custom Audio and Accessories, LLC (collectively, "King Kong"), in violation of N.M. Stat. Ann.

§ 59A-16, the New Mexico Unfair Insurance Practices Act ("UIPA"); (ii) whether Peerless

Indemnity's actions have violated the UIPA; (iii) whether Peerless Indemnity violated N.M. Stat.

Ann. § 57-12-3, the Unfair Practices Act ("UPA"); (iv) whether Peerless Indemnity breached the

covenant of good faith and fair dealing; (v) whether Peerless Indemnity has violated its fiduciary

duty to King Kong, and (vi) whether Peerless Indemnity committed constructive fraud, because it

did not disclose specific knowledge to King Kong during the adjustment process. The Court

concludes that: (i) Peerless Indemnity has demonstrated that it did not breach its contract with King Kong in violation of UIPA; (ii) Peerless Indemnity has not demonstrated that it did not violate the UIPA by delaying payment of the business income claim; (iii) Peerless Indemnity has demonstrated that it did not violate the UPA; (iv) Peerless Indemnity has not demonstrated that it did not breach the covenant of good faith and fair dealing; (v) Peerless Indemnity does not have a fiduciary duty to King Kong; and (vi) King Kong has not shown that Peerless Indemnity committed constructive fraud.

## **FACTUAL BACKGROUND**

The Court draws its factual background from First MSJ, the Second MSJ, the Plaintiff's D[sic] Response in Opposition to Defendant's Motion for Summary Judgment, filed March 24, 2020 (Doc. 52)("First MSJ Response"); the Plaintiff's Response in Opposition to the Defendant's Second Motion for Summary Judgment, filed March 24, 2020 (Doc. 53)("Second MSJ Response"); the Defendant's Reply Brief in Support of Its First Motion For Summary Judgment on Count I of the Complaint, filed April 7, 2020 (Doc. 56)("First MSJ Reply"); the Defendant's Reply Brief in Support of Its Second Motion for Summary Judgment, filed April 7, 2020 (Doc. 57)("Second MSJ Reply").

On March 8, 2014 Peerless issued an Insurance Policy to King Kong, Businessowners' Policy No. BOP1037231, for February 24, 2014, through February 24, 2015.  See First MSJ ¶ 1, at 4 (asserting that Peerless issued an Insurance Policy to King Kong, Businessowners' Policy No. BOP1037231, for February 24, 2014, through February 24, 2015)(citing Relevant Excerpts of

Businessowners' Policy No. BOP1037231, filed March 6, 2020 (Doc. 46-1)("Policy Excerpts");[1] First MSJ Response ¶ 1, at 1 (asserting that Peerless Indemnity issued an Insurance Policy to King Kong, Businessowners' Policy No. BOP1037231 on March 8, 2014); Policy Excerpts at 1 (confirming both of those statements).

The applicable Commercial Protector Coverage Form Declarations and Businessowners Coverage Form Declarations (collectively, "the Declarations"), which were issued April 10, 2014, provided coverage for business personal protection up to $202,800.00.  See First MSJ ¶ 2, at 4 (citing Policy Excerpts at 1-3)(noting that the business personal protection coverage is the date of the June 20, 2014 fire).  See First MSJ Response at 1 (not controverting this fact).[2]  The Declarations stated that "'Business Income is included as an Additional Coverage not subject to [the Business Personal Property] limits below."  First MSJ ¶ 3, at 4 (citing Policy Excerpts at 1-3)[3]; Policy Excerpts at 1; First MSJ Response at 1 (not controverting this fact).  The Policy states

**SECTION I – PROPERTY**

A.        **Coverage**

---

[1] When referencing the Policy Excerpt's page numbers, the Court uses the page numbers that were printed on the top of the document after filing, and not the discovery production page numbers.

[2] The local rule requires the non-movant to specifically controvert a fact for the Court to deem the fact in dispute.  See D.N.M.LR-Civ. 56.1(b) ("All material facts set forth in the Memorandum will be deemed undisputed unless specifically controverted.").  The Plaintiffs do not controvert the dates of the policy, and thus the Court deems the dates undisputed.

[3] Peerless Indemnity quotes the Policy as saying that "Business Income is included as an Additional Coverage not subject to the BPP limits," but the record shows that the Policy says "Business Income is included as an Additional Coverage not subject to the limits below," referencing the business personal property limits.  Compare First MSJ ¶ 3, at 4 with Policy Excerpts at 1.  The Court adopts the fact with a correction to more accurately reflect the record.

- 3 -

We will pay for direct physical loss of or damage to Covered Property at the premises described in the Declarations caused by or resulting from any Covered Cause of Loss.

**1.** **Covered Property**

Covered Property includes Buildings as described under Paragraph a. below, Business Personal Property as described under Paragraph b. below, or both, depending on whether a Limit of Insurance is shown in the Declarations for that type of property.

. . . .

**b**.    **Business Personal Property** located in or on the buildings at the described premises or in the open (or in a vehicle) within 1,000 feet of the described premises, including:

**(1)**    Property you own that is used in your business;

**(2)**    Property of others that is in your care, custody or control, except as otherwise provided in Loss Payment Property Loss Condition Paragraph **E.6.d.(3)(b)**;

**(3)**    Tenant's improvements and betterments. Improvements and betterments are fixtures,
**(a)**    Made a part of the building or structure you occupy but do not own; and
**(b)**    You acquired or made at your expense but cannot legally remove[.]

. . . .

**5.**    **Additional Coverages**

**a.**    **Debris Removal**

**(1)**    **Subject to Paragraphs (3) and (4)**, we will pay your expense to remove debris of Covered Property caused by or resulting from a Covered Cause of Loss that occurs during the policy period. The expenses will be paid only if they are reported to us in writing within 180 days of the date of direct physical loss or damage.

. . . .

**f.**      **Business Income**

**(1)**      **Business Income**

>    **(a)**      We will pay for the actual loss of Business Income you sustain due to the necessary suspension of your "operations" during the "period of restoration". The suspension must be caused by direct physical loss of or damage to property at the described premises. The loss or damage must be caused by or result from a Covered Cause of Loss. With respect to loss of or damage to personal property in the open or personal property in a vehicle, the described premises include the area within 1,000 feet of the site at which the described premises are located.

. . . .

>    **(b)**      We will only pay for loss of Business Income that you sustain during the "period of restoration" and that occurs within 12 consecutive months after the date of direct physical loss or damage. We will only pay for ordinary payroll expenses for 60 days following the date of direct physical loss or damage, unless a greater number of days is shown in the Declarations.

>    **(c)**      Business Income means the:

>      **(i)**      Net Income (Net Profit or Loss before income taxes) that would have been earned or incurred if no physical loss or damage had occurred, but not including any Net Income that would likely have been earned as a result of an increase in the volume of business due to favorable business conditions caused by the impact of the Covered Cause of Loss on customers or on other businesses; and

>      **(ii)**      Continuing normal operating expenses incurred, including payroll.

>    **(d)**      Ordinary payroll expenses[.]

**g.**     **Extra Expense**

**(1)**     We will pay necessary Extra Expense you incur during the "period of restoration" that you would not have incurred if there had been no direct physical loss or damage to property at the described premises. The loss or damage must be caused by or result from a Covered Cause of Loss. With respect to loss of or damage to personal property in the open or personal property in a vehicle, the described premises include the area within 1,000 feet of the site at which the described premises are located.

. . . .

**(2)**     Extra Expense means expense incurred:

    **(a)**     To avoid or minimize the suspension of business and to continue "operations":

        **(i)**     At the described premises; or

        **(ii)** At replacement premises or at temporary locations, including relocation expenses and costs to equip and operate the replacement or temporary locations.

    **(b)**     To minimize the suspension of business if you cannot continue "operations".

    **(c)**     To:

        **(i)**     Repair or replace any property[.]

. . . .

**(3)**     With respect to the coverage provided in this Additional Coverage, suspension means:

    **(a)**     The partial slowdown or complete cessation of your business activities; and

    **(b)**     That a part or all of the described premises is rendered untenantable, if coverage for Business Income applies.

    **(4)**    We will only pay for Extra Expense that occurs within 12 consecutive months after the date of direct physical loss or damage. This Additional Coverage is not subject to the Limits of Insurance of

## SECTION I - PROPERTY.

. . . .

    **6.**    **Coverage Extensions**

In addition to the Limits of Insurance of **SECTION I – PROPERTY**, you may extend the insurance provided by this policy as provided below.

. . . .

    **d.**    **Personal Effects**

    You may extend the insurance that applies to Business Personal Property to apply to personal effects owned by you, your officers, your partners or "members", your "managers" or your employees. This extension does not apply to:

    **(1)**    Tools or equipment used in your business; or
    **(2)**    Loss or damage by theft.

    The most we will pay for loss or damage under this Extension is $2,500 at each described premises.

. . . .

    **f.**    **Accounts Receivable**

    **(1)**    You may extend the insurance that applies to Business Personal Property to apply to accounts receivable. We will pay:

    **(a)**    All amounts due from your customers that you are unable to    collect [...],
that result from direct physical loss or damage by any Covered Cause of Loss to your records of accounts receivable.

## C.    Limits Of Insurance

. . . .

    **4.**      **Automatic Increase**

        **b.**      **Business Personal Property Limit**

           **(1)**    The Limit of Insurance for Business Personal Property will automatically increase by the annual percentage shown in the Declarations.

**E.**      **Property Loss Conditions**

. . . .

    **3.**      **Duties In The Event Of Loss Or Damage**

        **a.**      You must see that the following are done in the event of loss or damage to Covered Property:

. . . .

           **(4)**    Take all reasonable steps to protect the Covered Property from further damage, and keep a record of your expenses necessary to protect the Covered Property, for consideration in the settlement of the claim. This will not increase the Limit of Insurance of SECTION I - PROPERTY. However, we will not pay for any subsequent loss or damage resulting from a cause of loss that is not a Covered Cause of Loss. Also, if feasible, set the damaged property aside and in the best possible order for examination.

           **(5)**    At our request, give us complete inventories of the damaged and undamaged property. Include quantities, costs, values and amount of loss claimed.

. . . .

           **(7)**    Send us a signed, sworn proof of loss containing the information we request to investigate the claim. You must do this within 60 days after our request. We will supply you with the necessary forms.

           **(8)**    Cooperate with us in the investigation or settlement of the claim.

- 8 -

. . . .

**6.** Send us a signed, sworn proof of loss containing the information we request to investigate the claim. You must do this within 60 days after our request. We will supply you with the necessary forms.

**7.** Cooperate with us in the investigation or settlement of the claim.

**(1)** Pay the value of lost or damaged property;

**(2)** Pay the cost of repairing or replacing the lost or damaged property;

**(3)** Take all or any part of the property at an agreed or appraised value; or

**(4)** Repair, rebuild or replace the property with other property of like kind and quality.

**b.** We will give notice of our intentions within 30 days after we receive the sworn proof of loss.

**c.** We will not pay you more than your financial interest in the Covered Property.

**d.** Except as provided in Paragraphs (2) through (8) below, we will determine the value of Covered Property as follows:

**(1)** At replacement cost without deduction for depreciation, subject to the following:

**(a)** You may make a claim for loss or damage covered by this insurance on an actual cash value basis instead of on a replacement cost basis. In the event you elect to have loss or damage settled on an actual cash value basis, you may still make a claim on a replacement cost basis if you notify us of your intent to do so within 180 days after the loss or damage.

**(b)** We will not pay on a replacement cost basis for any loss or damage:

**(i)** Until the lost or damaged property is actually repaired or replaced; and

**(ii)** Unless the repairs or replacement are made as soon as reasonably possible after the loss or damage.

. . . .

>> **(3)**    The following property at actual cash value:
>>
>> > **(a)**    Used or second-hand merchandise held in storage or for sale;
>> >
>> > **(b)**    Property of others. However, if an item(s) of personal property of others is subject to a written contract which governs your liability for loss or damage to that item(s), then valuation of that item(s) will be based on the amount for which you are liable under such contract, but not to exceed the lesser of the replacement cost of the property or the applicable Limit of Insurance;
>
> **e.**     Our payment for loss of or damage to personal property of others will only be for the account of the owners of the property. We may adjust losses with the owners of lost or damaged property if other than you. If we pay the owners, such payments will satisfy your claims against us for the owners' property. We will not pay the owners more than their financial interest in the Covered Property.

First MSJ  ¶ 4, at 4-11 (quoting King Kong Claim File at 5-21, filed March 6, 2020 (Doc. 46-2)("Claim")).[4]

King Kong had a fire at its business on June 20, 2014, for which it filed a claim on June 20, 2014.  See First MSJ at 11 (asserting this fact)(citing King Kong Claim File at 12-13, filed March 6, 2020 (Doc. 46-2)("Claim")).[5]  An inspection of the scene on June 23, 2014, demonstrated that the fire began in a dust collector located in the woodworking shop.  See First MSJ 6, at 11 (asserting this fact)(citing Claim at 11).  Vincent Mullaney, a Peerless Indemnity employee, stated

---

[4]When referencing the Claim's page numbers, the Court uses the page numbers that were printed on the top of the document after filing, and not the discovery production page numbers.

[5]Plaintiffs agreed that King Kong "suffered a fire" on June 20, 2014, and because they did not specifically controvert the rest of the fact as D.N.M.LR-Civ. 56.1(b) requires, the Court adopts the entire fact.  First MSJ Response ¶ 3, at 1.

that "'the insured would have been responsible for maintaining the machine and bag.'"  First MSJ 6, at 11 (asserting this fact)(quoting Claim at 10); Claim at 9-10 (asserting this fact); First MSJ Response at 1 (not disputing this fact).

On June 24, 2014, Peerless Indemnity hired Greer & Kirby to perform an inventory of the premises and a "'salvage assignment.'" First MSJ ¶ 7, at 11 (quoting Claim at 10, and citing Claim at 10, 16, 17, 18); First MSJ Response ¶ 4, at 1 (asserting that Peerless Indemnity hired[6] "Greer & Kirby to complete a Post-fire [sic] on-site inventory on June 24, 2014").   On or about June 25, 2014, Peerless Indemnity hired Terry Dark, an independent adjuster from Santa Fe Adjustment company, who met with Nilson.  See First MSJ 8, at 11 (asserting this fact)(citing Claim at 163); First MSJ Response at 1 (not specifically disputing this fact).   On June 26, 2014, Peerless Indemnity's adjuster, Shatto, referred the business income loss claim to the Loss Audit Department.  See First MSJ ¶ 9, at 12 (asserting this fact)(citing Claim at 9); First MSJ Response at 1 (not specifically disputing this fact).

On June 30, 2014, Rich Lien from Greer & Kirby met with Nilson to conduct the on-site inventory.  See First MSJ ¶ 10, at 12 (asserting this fact)(citing Claim at 20-21; citing Second King Kong Claim File at 13-14, filed March 6, 2020 (Doc. 46-3)("Second Part of Claim");[7] First MSJ Response at 1 (not specifically disputing this fact).  On June 30, 2014, Brian Bukoskey, a Loss Audit Department employee, called Nilson to discuss his claim.  See First MSJ ¶ 11, at 12

---

[6]The First MSJ Response says that Peerless Indemnity "fired," not hired, Greer & Kirby, but the Court attributes this spelling to a typographical error.

[7]When referencing the Second Part of Claim's page numbers, the Court uses the page numbers that were printed on the top of the document after filing, and not the discovery production page numbers.

(asserting this fact)[8](citing Claim at 21); First MSJ Response at 1 (not specifically disputing this fact).

On July 2, 2014, Bukoskey emailed Nilson a request for "tax returns, monthly profit and loss statements, daily sales reports, and payroll documents" (collectively, "financial documents"). First MSJ ¶ 12, at 12 (asserting this fact)(providing the short citation for "financial documents)(citing King Kong Claim File, filed March 6, 2020 (Doc. 46-6)("Sixth Part of Claim"); First MSJ Response at 1 (not specifically disputing this fact).[9]  Shatto communicated with Nilson "on numerous occasions" by July 2, 2014.  First MSJ ¶ 13, at 12 (asserting this fact)(citing Claim at 21); First MSJ Response at 1 (not specifically disputing this fact).  During their conversations, Shatto told Nilson that "Loss Audit would need 'tax returns and profit and loss statements' and asked Mr. Nilson provide information regarding rent and costs incurred in establishing a temporary location for the business."  First MSJ ¶ 13, at 12 (quoting Claim at 21); First MSJ Response at 1 (not specifically disputing this fact).  When Lien gave Peerless Indemnity his initial report on July 2, 2014, Lien indicated that the report "was missing information that had been requested from Mr. Nilson regarding pricing of the inventory listed in the report."  First MSJ ¶ 14, at 12 (citing Claim at 21, 40-61); First MSJ Response at 1 (not specifically disputing this fact).

On July 2, 2014, Lien "sent the inventory list directly to Mr. Nilson and specifically requested that he review the estimates to ensure accuracy and to provide him information for

---

[8]Although the First MSJ states that Bukokskey called Nilson to discuss the business income claim specifically, the cited portion of the record supports only that he called Nilson to discuss a claim.

[9]When referencing the Second Part of Claim's page numbers, the Court uses the page numbers that were printed on the top of the document after filing, and not the discovery production page numbers.

value/pricing of the items that contained blanks."  First MSJ ¶ 15, at 12 (citing Claim at 22-39);

First MSJ Response at 1 (not specifically disputing this fact).  On July 9, 2014, Lien told Shatto

that, although Lien had received some information from King Kong, but was still missing receipts

and other documentation to prove values on the higher priced items" and that Nilson had added a

significant quantity of items that Shatto did not see when he was on-site.  First MSJ ¶ 16, at 12-13

(asserting this fact)(citing Claim at 62); First MSJ Response at 1 (not specifically disputing this

fact).

      On July 9, 2014, Lien provided Shatto an updated inventory that calculated the total BPP

loss "for the items identified in the original inventory []as $138,540.77."  First MSJ ¶ 17, at 13

(asserting this fact)(citing Claim at 86); First MSJ Response at 1 (not specifically disputing this

fact).  On July 10, 2014, Bukoskey emailed Nilson to ask him for the first time the business' start

date and what insurance proceeds were recorded as income in 2013, and to ask him a second time

for monthly profit and loss statements from April, 2014, through June 2014, and the weekly or bi-

weekly payroll summary reports from May 15, 2014, through July, 2014.  See First MSJ ¶ 18, at

13 (asserting this fact)(citing Fifth Part of Claim at 27-28); First MSJ Response at 1 (not

specifically disputing this fact).[10]  On July 10, 2014, Shatto "contacted Nilson and provided him

with a Sworn Statement for Advance Payment" and advised Nilson that

> According to Rich Lien with Greer & Kirby there are many items
> that can be cleaned for re-use. You and/or your employees can clean
> these items and keep track of the labor time.  We can add that to

---

[10]Peerless Indemnity proffers that Bukoskey requested "the information previously
requested on July 2, 2014."  The Court alters this fact, because the record does not support it.  The
portion of the record to which Peerless Indemnity cites shows that Bukoskey asked for: (i) the
daily sales from May 15, 2014, through June 30, 2014; (ii) the monthly profit and loss statements
from January, 2013, through March, 2014; (iii) business tax returns and all schedules for the years
2012 and 2013; and (iv) a copy of the lease, if applicable, in the July 2, 2014 email, and not the
July 10, 2014 email.  First MSJ 18, at 13; Claim at 27-28.

your claim for the loss to business personal property. You can also contact a local restoration company to provide a proposal for cleaning and restoring the salvageable property. Please send me a copy of any proposals that you receive from a restoration company.

Please notate on the list prepared by Rich the ownership on the items, whether the owner is King Kong, customers or employees. Also notate the property that you think can be cleaned/restored for re-use in your operations.

Please send me an inventory of the additional items that are not on the list that we just discussed during the phone conversation. Please include the property that could be considered tenant improvements, such as the paint booth and lifts. Your business personal property coverage includes improvements that you have made to the building.

The lease agreement with your landlord does indicate that the ownership of the improvements immediately vests with the landlord.

Please send me a copy of the proposed lease agreement on the temporary location. Also, please advise the anticipated cost of any modifications, including equipment set up, that will be necessary for you to resume operations within the temporary location.

Please send me copies of the invoices for the tents that you purchased so your employees could work in the parking lot. Send any other receipts that you have for expenses incurred to minimize the suspension of operations.

First MSJ ¶ 19, at 13-14 (quoting Claim at 102); First MSJ Response at 1 (not specifically disputing this fact). On July 15, 2014, Shatto asked Lien to return to the scene of the fire "to address items Mr. Nilson was claiming were missed and verify quantities and values." First MSJ ¶ 20, at 14 (citing Claim at 103). See First MSJ Response at 1 (not disputing this fact).

On July 15, 2014, Peerless Indemnity gave King Kong a $50,000.00 advance under the business personal property coverage portion of the Policy. See First MSJ ¶ 21 at 14 (asserting this fact)(citing Claim at 21, 101; Second Part of Claim at 58); First MSJ Response at 1 (not disputing this fact). "On July 21, 2014, Mr. Lien met with Mr. Nilson for a second inventory." First MSJ

22, at 14 (asserting this fact)(citing Second Part of Claim at 13).  See First MSJ Response at 1 (not disputing this fact).

On July 22, 2014, Lien gave Shatto "an updated report, which included a current working copy of the inventory based on his second visit to the site of the loss," and he noted that the report was not finalized, because he was waiting for King Kong to provide him with information that he had requested.  First MSJ ¶ 23, at 14 (asserting this fact)(citing Claim at 19, 104-22; Second Part of Claim at 1-12).  See First MSJ Response at 1 (not disputing this fact).  On August 5, 2014, Lien e-mailed King Kong and asked it to provide the "final list on employee items that can't be cleaned and retained."  First MSJ ¶ 24, at 14 (citing Claim at 15-16).  See First MSJ Response at 1 (not disputing this fact).

On August 19, 2014, Shatto asked Nilson for "additional information for the items on the inventory, including ownership and age of each item, original receipts and invoices related to costs incurred related to operating out of the temporary location."  First MSJ ¶ 25, at 14 (asserting this fact)(citing Claim at 987).  See First MSJ Response at 1 (not disputing this fact).  On August 20, 2014, Bukoskey emailed Nilson to ask him again for the monthly profit and loss statements for April, 2014, onwards and for weekly or bi-weekly payroll summary reports from May 15, 2014, onwards.  See First MSJ ¶ 26, at 14 (citing Fifth Part of Claim at 26-27);[11]  First MSJ Reply at 1

_____

[11]Peerless Indemnity proffers the fact that Bukoskey asked Nilson  "to provide financial documents needed to substantiate his BI Loss claim."  First MSJ ¶ 26, at 14 (citing Fifth Part of Claim at 26-27).  The record, when coupled with Peerless Indemnity's definition of "financial documents," does not support this fact, so the Court does not adopt it.  The portion of the record to which Peerless cites indicates that Bukoskey emailed Nilson to ask him again for the monthly profit and loss statements for April, 2014 onwards and for weekly or bi-weekly payroll summary reports from May, 15, 2014, onwards.  See Fifth Part of Claim at 26-27.  The Court thus alters the fact to accord with the record.

(not disputing this fact).  On September 3, 2014, Shatto emailed Nilson and asked Nilson for a status update "on the information [Shatto] requested in his August 19, 2014 e-mail."  First MSJ ¶ 27, at 14 (asserting this fact)(citing Second Part of Claim at 18).  See First MSJ Response at 1 (not disputing this fact).

On September 17, 2014, Bukoskey emailed Nilson and asked Nilson for monthly profit and loss statements from April, 2014, onwards, and for weekly or bi-weekly payroll summary reports from May 15, 2014, onwards.  See First MSJ ¶ 28, at 14 (citing Fifth Part of Claim at 25).[12] On September 15, 2014, "Lien updated the inventory list with the information" that Nilson gave to Lien.  First MSJ ¶ 29, at 15 (asserting this fact)(citing Second Part of Claim at 20-26).  See First MSJ Response at 1 (not disputing this fact).

On October 3, 2013, Shatto updated the Loss Schedule "to reflect the numbers provided by [] Lien, which showed" $135,888.95 in business personal property losses.  First MSJ ¶ 30, at 15 (asserting this fact)(citing Second Part of Claim at 57).  See First MSJ Response at 1 (not disputing this fact).  On October 3, 2014, Shatto wrote to King Kong to notify them that Shatto had issued an additional $50,000.00 advance.  See First MSJ at 31 (asserting this fact)(citing Claim at 6; Second Part of Claim at 19, 58); First MSJ Response at 1 (not disputing this fact).  Shatto also notified King Kong that King Kong "could recover replacement cost value" and he asked King

---

[12]Peerless Indemnity proffers the fact that, on September 17, 2014, Bukoskey emailed Nilson and asked Nilson for "the financial documents [Shatto] previously requested."  First MSJ ¶ 28, at 14 (citing Fifth Part of Claim at 25).  The record, when coupled with Peerless Indemnity's definition of "financial documents," does not support this fact, so the Court does not adopt it.  The portion of the record to which Peerless Indemnity cites indicates that Bukoskey asked Nilson for monthly profit and loss statements from April, 2014, onwards, and for weekly or bi-weekly payroll summary reports from May 15, 2014, onwards.  See Fifth Part of Claim at 25.  The Court thus alters the fact to accord with the record.

Kong to "provide receipts showing any items that had been replaced."  First MSJ ¶ 31, at 15 (asserting this fact)(citing Claim at 17; Second Part of Claim at 19, 58).  See First MSJ Response at 1 (not disputing this fact).[13]

Mr. Bukoskey requested the monthly profit and loss statements from April, 2014 onwards and for weekly or bi-weekly payroll summary reports from May 15, 2014, onwards again on October 15, 2014.[14]  See First MSJ ¶ 32, at 15 (citing Fifth Part of Claim at 24).  On October 31, 2014, Shatto "offered to settle the BPP on an actual cash value basis for $135,000" and reminded Nilson that Nilson could recover the replacement cost value if Nilson submitted receipts as the Policy required.  First MSJ ¶ 33, at 15 (asserting this fact)(citing Second Part of Claim at 59).  See First MSJ Response at 1 (not disputing this fact).

"On November 24, 2014, Peerless Indemnity issued a third advance of $50,000, consisting of $35,000 for BPP and $15,000 for BI Loss."  First MSJ ¶ 34, at 14 (asserting this fact)(citing Claim at 5).  On November 11, 2014, December 9, 2014, January 5, 2015, January 21, 2015, and

---

[13]Peerless Indemnity asserts that Shatto asked King Kong  "provide receipts showing any items that had been replaced."  First MSJ 31, at 15 (asserting this fact)(citing Claim at 17; Second Part of Claim at 19, 58).  The portion of the record to which Peerless Indemnity cites does not support this fact.  Thus, the Court does not adopt this fact.

[14]Peerless Indemnity asserts that, on October 5, 2014, Bukoskey again requested the financial documents from King Kong.  See First MSJ ¶ 32, at 15 (citing Fifth Part of Claim at 24).  The portion of the record to which Peerless Indemnity cites, when coupled with Peerless Indemnity's definition of financial records, does not support this fact.  The portion of the record shows that, on October 5, 2014, Bukoskey again asked for monthly profit and loss statements from April, 2014 onwards and for weekly or bi-weekly payroll summary reports from May 15, 2014, onwards.  See Fifth Part of Claim at 24.  The Court thus alters the fact accordingly.

February 17, 2015, Bukoskey requested the monthly statements.  First MSJ ¶ 35, at 14 (asserting this fact)(citing Fifth Part of Claim at 21-23).[15]

On March 11, 2015, Shatto mailed Nilson a letter notifying Nilson "that Peerless advanced $150,000 on King Kong's claim which included $135,000 BPP and $15,000 for BI Loss."  First MSJ ¶ 36, at 15 (asserting this fact)(citing Second Part of Claim at 60-64).  In the letter, Shatto "again explained the Policy requirements regarding replacement cost coverage and informed him the BPP coverage limits were $202,800 plus the automatic 4% increase of $2,578."  First MSJ ¶ 36, at 15-16 (citing Second Part of Claim at 60-64).  Relying on the Greer & Kirby inventory, Shatto calculated the BPP claim as $263,992.47, including $3,445.97 for debris removal.  See First MSJ ¶ 36, at 16 (citing Second Part of Claim at 60-64).  "The actual cash value for the loss was $133,719.22."  First MSJ ¶ 36, at 16 (citing Second Part of Claim at 60-64).  "Shatto cited various applicable provisions of the Policy, including loss payment conditions, coverage for replacement cost value, debris removal, personal effects, business income and extra expense."  First MSJ ¶ 36, at 16.  See First MSJ Response at 1 (disputing none of these facts).

On March 18, 2015, April 14, 2015, and May 14, 2015, Bukoskey again requested the financial documents.  See First MSJ ¶ 37, at 16 (asserting this fact)(citing Fifth Part of Claim at

---

[15]Peerless Indemnity asserts that, on November 11, 2014, December 9, 2014, January 5, 2015, January 21, 2015, and February 17, 2015, Bukoskey again requested the "financial documents" from King Kong.  First MSJ ¶ 35, at 14 (asserting this fact)(citing Fifth Part of Claim at 21-23). The portion of the record to which Peerless Indemnity cites, when coupled with Peerless Indemnity's definition of financial records, does not support this fact.  The portion of the record shows that, on November 11, 2014, December 9, 2014, January 5, 2015, January 21, 2015, and February 17, 2015, Bukoskey again asked for monthly profit and loss statements from April, 2014 onwards and for weekly or bi-weekly payroll summary reports from May 15, 2014, onwards.  See Fifth Part of Claim at 24.  The Court thus alters the fact accordingly.

20-21);[16] First MSJ Response at 1 (not disputing this fact).  On May 27, 2015, Shatto emailed King Kong to ask about debris removal and to advise King Kong "that the invoice would be added the claim settlement once it had been paid and asked for invoices to support replacement costs."  First MSJ ¶ 38, at 16 (asserting this fact)(citing Second Part of Claim at 65).  See First MSJ Response at 1 (not disputing this fact).

On June 11 and June 22, 2015, "Bukoskey requested the financial documents again."  First MSJ ¶ 39, at 16 (asserting this fact)(citing Fifth Part of Claim at 19).[17]  On June 23, 2015, Nilson faxed to Shatto "three sets of documents, consisting of invoices and receipts."  First MSJ ¶ 40, at 16  (citing  xh.  B,  pp.  001418-001462,  001463-001498,  and  001499  to  001530).   "Bukoskey requested the financial documents again on June 30, and July 20, 2015."  First MSJ ¶ 41, at 16 (asserting this fact)(citing Claim at 2079)  Shatto sent Nilson an email dated August 17, 2015, in which he advised Nilson that Shatto "could not decipher from the faxed documents whether the receipts submitted reflected the expense incurred in replacing the property, that some of the

---

[16]Peerless Indemnity asserts that, on March 18, 2015, April 14, 2015, and May 14, 2015, Bukoskey requested the "financial documents" from King Kong.  First MSJ ¶ 37, at 16 (asserting this fact)(citing Fifth Part of Claim at 20-21). The portion of the record to which Peerless Indemnity cites, when coupled with Peerless Indemnity's definition of financial records, does not support this fact.  The portion of the record shows that, on March 18, 2015, April 14, 2015, and May 14, 2015, Bukoskey asked King Kong again for monthly profit and loss statements from April, 2014 onwards and for weekly or bi-weekly payroll summary reports from May 15, 2014, onwards.  See Fifth Part of Claim at 20-21.  The Court thus alters the fact accordingly.

[17]Peerless Indemnity asserts that, on June 11, 2015, and June 22, 2015, Bukoskey requested the "financial documents" from King Kong.  First MSJ ¶ 39, at 16 (asserting this fact)(citing Fifth Part of Claim at 19). The portion of the record to which Peerless Indemnity cites, when coupled with Peerless Indemnity's definition of financial records, does not support this fact.  The portion of the record shows that, on June 11, 2015, and June 22, 2015, Bukoskey asked King Kong for the 2014 business tax return and schedules, for monthly profit and loss statements from April, 2014 onwards and for weekly or bi-weekly payroll summary reports from May 15, 2014, onwards.  See Fifth Part of Claim at 19.  The Court thus alters the fact accordingly.

receipts were not legible, that some of the receipts did not provide sufficient detail to identify which category of coverage the receipts related to and that a number of receipts appeared to relate to a specific job as opposed to the replacement of property that was in the building at the time of the loss." First MSJ 42, at 16 (asserting this fact)(citing Claim at 1540). Shatto "further advised that receipts totaled approximately $25,000 and Peerless has already advanced payments in the amount of $135,000." First MSJ ¶ 42, at 16-17 (asserting this fact)(citing Claim at 1540). Shatto also "stated that he was still awaiting, over one year after the loss, the financial documents." First MSJ ¶ 42, at 17 (asserting this fact)(citing Claim at 1540). "He requested that the information be provided within 30 days." First MSJ ¶ 42, at 17 (asserting this fact)(citing Claim at 1540).

In an August 17, 2015 email, Bukoskey requested the financial documents from Nilson. See First MSJ ¶ 43, at 17 (asserting this fact)(citing Claim at 17); First MSJ Response at 1 (not disputing this fact). On September 15, 2015, Bukoskey called Nilson, left Nilson a message, and "sent a follow up e-mail requesting the financial documents again and identifying the documents that had been requested but not produced." First MSJ ¶ 44, at 17 (citing Claim at 17).

On September 29, 2015, Shatto sent Nilson a letter advising Nilson "that the claim would be closed if a response was not received by October 27, 2015" and "reiterat[ing] the contents of his March 11, 2015 letter." First MSJ ¶ 45, at 17 (asserting this fact)(citing Fifth Part of Claim at 2-7). See First MSJ Response at 1 (not disputing this fact). "On October 13, 2015, Mr. Bukoskey spoke with Mr. Nilson on the telephone and followed up with an e-mail requesting a status of the records he had requested to support the BI loss claim." First MSJ ¶ 46, at 17 (asserting this fact)(citing Fifth Part of Claim at 16).[18] "On November 2, 2015, Mr. Shatto closed the file." First

---

[18]Peerless Indemnity asserts that the claim discussed in the email is the business inventory claim. See First MSJ ¶ 46, at 17. The portion of the record to which Peerless Indemnity cites

MSJ ¶ 47, at 17 (asserting this fact)(citing Claim at 4; Fifth Part of Claim at 8-11).  See First MSJ Response at 1 (not disputing this fact).

"On November 9, 2015, Mr. Bukoskey e-mailed Mr. Nilson asking whether he was going to be sending the documents to support his BI loss claim."  First MSJ ¶ 48, at 17 (asserting this fact)(citing Fifth Part of Claim at 16).  See First MSJ Response at 1 (not disputing this fact). "On July 20, 2016, Mr. Nilson requested that the claim be reopened."  First MSJ ¶ 49, at 17 (asserting this fact)(citing Fifth Part of Claim at 12-16).  See First MSJ Response at 1 (not disputing this fact).  "Mr. Bukoskey responded to Mr. Nilson that same day identifying various documents that had still not been provided."  First MSJ ¶ 50, at 18 (asserting this fact)(citing Fifth Part of Claim at 13).  See First MSJ Response at 1 (not disputing this fact).

On July 20, 2016, Shatto emailed Nilson stating what documentation Shatto needed to finalize the claim and asking Nilson for an explanation of why he ignored previous requests for information and documentation.  See First MSJ ¶ 51, at 18 (citing Fifth Part of Claim at 12).[19]  On August 8, 2016, Shatto reopened the claim.  See First MSJ ¶ 52, at 18 (citing Fifth Part of Claim at 29-30).  On August 10, 2016, Bukoskey notified Nilson that Nilson needed to submit the payroll reports from June 29, 2014, to July 12, 2014, and the 2015 tax returns.  See First MSJ ¶ 53, at 18 (citing Fifth Part of Claim at 31); First MSJ Response at 1 (not disputing this fact).  On August 22, 2016, Bukoskey sent Nilson an e-mail advising that he still needed the 2015 tax returns for King

---

does not support that the claim is the business inventory claim.  See Fifth Part of Claim at 16.  The Court alters the fact accordingly.

[19]Peerless Indemnity cited "002415" for this fact, which does not exist in the document it submitted.  First MSJ ¶ 50, at 18.  The Court substitutes the correct citation to the record.

Kong.  See First MSJ ¶ 54, at 18 (citing Fifth Part of Claim at 32); First MSJ Response at 1 (not disputing this fact).

On September 14, 2016, Shatto asked Nilson for a status update regarding the 2015 tax return.  See First MSJ ¶ 55, at 18 (citing Fifth Part of Claim at 54); First MSJ Response at 1 (not disputing this fact).  On September 15, 2016, Mr. Nilson sent the 2015 tax returns.  See First MSJ ¶ 56, at 18 (citing Fifth Part of Claim at 33-35); First MSJ Response at 1 (not disputing this fact). On September 30, 2016, Shatto e-mailed Mr. Nilson business income claim's evaluation.  See First MSJ ¶ 57, at 18 (citing Fifth Part of Claim at 33-53).  On October 4, 2016, Shatto e-mailed Nilson a letter identifying the Policy provisions applicable to the business income claim and explaining how the number was reached, stating

> We have received some receipts that are reported to show the expense incurred to replace business personal property. Some of the receipts are not legible, others do not show sufficient detail to identify the type of property. A number of the receipts appear to relate to a specific job as opposed to the replacement of property damaged by the fire. The receipts we can verify to show the incurred expense to replace fire damaged property total approximately $25,000. Again, we have advanced $135,000 for the loss of business personal property. Please send us any additional invoices that you may have demonstrating the expense incurred in replacing fire damaged business personal property. We attached a copy of the invoices we have received to our 8/17/2015 email which show which are not legible. Please send us legible copies. Please notate the type of property that was purchased when it is not clearly shown on the invoice.

First MSJ ¶ 58, at 18-19 (citing Sixth Part of Claim at 2).  See First MSJ Response at 1 (not disputing this fact).  On October 5, 2016, Shatto e-mailed Nilson a letter regarding the business inventory loss evaluation that stated:

> We have discussed in the past the need for you to send us the receipts for the incurred cost of the temporary location, that is covered by extra expense and is not part of our evaluation of the loss of income.

We also need any invoices or receipts for the expense incurred to relocate to the temporary location.  I think you indicated that you rented tents to continue operations in the parking lot at the loss location.  Send those receipts as well.

You also mentioned increased travel expenses related to having to operate at both the primary and temporary location.  Send me documentation that shows those incurred expenses.

I mentioned in the letter that it might be beneficial for you to share our measurement of the business income loss with your accountant.  We would be happy to discuss our measurement with you and your accountant.

First MSJ ¶ 59, at 19.  See First MSJ Response at 1 (not disputing this fact).

On or about October 26, 2016, Bukoskey talked to Nilson regarding their disagreement over the business income loss claim's value and "advised Mr. Nilson that if he did not agree with the calculations, to provide him with what Mr. Nilson is claiming and the documentation to support those numbers."  First MSJ ¶ 60, at 19 (citing Fourth Part of Claim at 12).  See First MSJ Response at 1 (not disputing this fact).  On May 8, 2017, Shatto tried to arrange a conference call to discuss the business income claim with Nilson and Nilson's accountant, but he was unsuccessful because Nilson did not provide his accountant's availability.  See First MSJ ¶ 61, at 20 (citing Claim at 3); First MSJ Response at 1 (not disputing this fact).  "Between October 30 and December 11, 2017, Mr. Shatto and Mr. Nilson discussed meeting to review documentation to support King Kong's claim."  First MSJ ¶ 62, at 20 (citing Sixth Part of Claim at 8-11.  First MSJ Response at 1 (not disputing this fact).

"On November 13, 2018, King Kong requested a copy of the Policy and a meeting in person" to review documentation supporting property replacement in regards to the business personal property claim.  First MSJ ¶ 63, at 20 (citing Claim at 2).  See First MSJ Response at 1 (not disputing this fact).  On November 28, 2018, Shatto emailed Nilson a certified copy of the Policy.  See First MSJ ¶ 64, at 20 (citing Claim at 1; Sixth Part of Claim at 13).  See First MSJ

Response at 1 (not disputing this fact).  Shatto and Nilson met in person on December 13, 2018.
<u>See</u> First MSJ ¶ 65, at 20 (citing Sixth Part of Claim at 14).  <u>See</u> First MSJ Response at 1 (not
disputing this fact).[20]

On December 17, 2018, Nilson sent Shatto additional documentation.  <u>See</u> First MSJ ¶ 66,
at 20 (citing Sixth Part of Claim at 15).  <u>See</u> First MSJ Response at 1 (not disputing this fact).
Shatto advised Nilson that he had reviewed the documents Nilson provided him at the December
2018 meeting.  <u>See</u> First MSJ ¶ 67, at 20 (citing Sixth Part of Exhibit at 16).  He indicated that he
was "able to associate a majority of the invoices to replacement of business personal property."
First MSJ ¶ 67, at 20 (citing Sixth Part of Claim at 16).  He asked, however, for additional
information on specific receipts attached to his e-mail.  <u>See</u> First MSJ ¶ 67, at 20 (citing Sixth Part
of Exhibit at 16).  <u>See</u> First MSJ Response at 1 (not disputing this fact).[21]

On January 28, 2019. Nilson responded to Shatto, asking Shatto what he wanted Nilson to
do with the attachment but not providing Shatto with any additional information relating to the
attachment.  <u>See</u> First MSJ ¶ 68, at 20 (citing Sixth Part of Claim at 17).  <u>See</u> First MSJ Response
at 1 (not disputing this fact).  "Peerless received notice of the lawsuit on February 7, 2019."  MSJ
¶ 69, at 20 (citing Sixth Part of Claim at 18).  First MSJ Response at 1 (not disputing this fact).
On June 12, 2019, Peerless Indemnity "determined that BPP losses in the amount of $207,553.75,

---

[20]Peerless Indemnity contends that Dotson was present at the in-person meeting on
December 13, 2018.  <u>See</u> MSJ ¶ 65, at 20 (citing Sixth Part of Claim at 14).  The portion of the
record to which Peerless Indemnity cites does not, however, support that Dotson attended the
meeting.  <u>See</u> Sixth Part of Claim at 14.  The Court, thus, alters the fact to accurately reflect the
record.

[21]Peerless Indemnity states this correspondence's date is January 24, 2019, but email is
not dated in record, so the Court does not adopt that date.  <u>See</u> MSJ ¶ 67, at 20 (citing Sixth Part
of Exhibit at 16).

BI in the amount of $27,027.00, Extra Expense in the amount of $2,071.80, and Coverage Extension in the amount of $3,237.58 had been substantiated." First MSJ ¶ 70, at 21 (citing Copy of June 12, 2019, King Kong Loss Schedule, filed March 6, 2020 (Doc. 46-8)). Peerless Indemnity made final payment to King Kong for $87,714.44. See First MSJ ¶ 70, at 21 (citing July 2, 2019 Check at 1, filed March 6, 2020 (Doc. 46-9)); First MSJ Response at 1 (not disputing this fact).[22] [23]

## PROCEDURAL HISTORY

Peerless Indemnity filed two motions for summary judgment. Peerless Indemnity filed its First MSJ addressing the Complaint's Count I -- Violation of Unfair Insurance Practices Act. See First MSJ at 1. In the Second MSJ, Peerless Indemnity asserts that, counter to the Complaint's Count II, Peerless Indemnity did not violate the UIPA.

### 1.   The First MSJ.

Peerless Indemnity argues in the First MSJ that, according to Plaintiffs, Peerless Indemnity breached the Policy, because it did not pay for (i) extra expenses; (ii) debris removal; (iii) accounts receivable; and (iv) business personal property coverage up to $202,800.00. See MSJ at 21. Peerless Indemnity notes that the Policy requires Peerless Indemnity to pay for "'direct physical loss of or damage to Covered Property at the premises described in the Declarations

---

[22]King Kong alleges that Peerless Indemnity "hired at least three different fire investigators in succession to investigate Plaintiff's fire on June 20, 2014." First MSJ Response ¶ 3, at 1. King Kong does not, however, cite to anything in the record to support this statement. See First MSJ Response ¶ 3, at 1. The Court, thus, does not adopt this fact.

[23]King Kong alleges that Peerless Indemnity and King Kong "engaged in an almost five (5) year back and forth communication with no full settlement and payment of the claims." First MSJ Response ¶ 5, at 1. King Kong does not, however, cite to anything in the record to support this statement. See First MSJ Response ¶ 5, at 1. Further, this statement is not a factual dispute, but a legal issue. The Court, thus, declines to adopt the fact.

caused by or resulting from any Covered Cause of Loss.'"  First MSJ at 21.  Peerless Indemnity

contends that the Policy includes "Property Loss Conditions" that require the insured to "([i]) at

Peerless Indemnity's request, give a complete inventory of the damaged and undamaged property,

including quantities, costs, values and amount of loss claimed; ([ii]) send a signed sworn proof of

loss containing the information requested needed to investigate the claim; and ([iii]) cooperate

with Peerless Indemnity in its investigation and settlement of the claim."  First MSJ at 21-22 (citing

Policy § I(E)(3)).  Peerless Indemnity also states that the Policy has a provision that allows Peerless

Indemnity to either pay for, repair, or replace damaged property.  See First MSJ at 22 (citing Policy

§ I(E)(6)).

Peerless Indemnity then argues that it did not breach the Policy regarding business personal

property coverage, because it paid more than the limit listed in the Policy for that coverage.  See

First MSJ at 23.  It argues that it paid King Kong a collective total of $239,890.13 and that it paid

$207,553.75 of that total to King Kong for business personal property coverage.  See MSJ at 23.

Peerless Indemnity noted that, despite King Kong ignoring requests for documentation to support

the business personal property claim, Peerless Indemnity gave King Kong an advance of

$50,000.00 on July 15, 2014.  See MSJ at 24 (citing Fact Nos. 14, 15, 16, 19, 23, 24, 25, 27).  After

Nilson provided the requested information, Lien completed the inventory on September 15, 2014,

he valued the business personal property loss at $135,888.95, and Shatto paid Nilson an additional

$50,000.00 on October 3, 2014.  See First MSJ at 24 (citing Facts No. 29, 30, 31, 33).  Shatto told

Nilson twice in October, according to Peerless Indemnity, that the Policy included a replacement

cost value requiring receipts of replacement item purchased.  See First MSJ at 24 (citing Fact Nos.

30, 31, 33).  Peerless Indemnity alleges that it did not receive any additional documents from King

Kong, and consequently it proceeded to pay "the remaining $35,000 of the substantiated BPP claim

to King Kong on November 24, 2014, along with a $15,000 advance on the BI loss claim."  First

MSJ at 24 (citing Fact No. 34).  According to Peerless Indemnity, Shatto asked Nilson on March

11, 2015, and May 27, 2015, for documentation to support additional BPP coverage, but that the

receipts that Nilson submitted on June 23, 2015 did not identify for what Nilson had paid.  See

First MSJ at 24 (citing Fact Nos. 36, 28, 40, 42).  Peerless Indemnity alleges that King Kong did

not respond to Shatto's request for information about the receipts or another request from Shatto

for information, and consequently, "the claim file was closed."  First MSJ at 24 (citing Fact No.

45).

  According to Peerless Indemnity, Nilson finally provided Shatto "the documentation he

had been requesting since June 2015" at their December, 2018 meeting, see MSJ at 25 (citing Fact

No. 67), and Shatto identified documents that "supported an additional payment under the Policy"

and consequently paid King Kong the remainder of the maximum payment under business personal

property coverage on July 2, 2019.  First MSJ at 27 (citing Fact No. 4).  Thus, Peerless Indemnity

argues, it did not breach the contract because "it had no contractual duty to pay more than what

the insured could substantiate" and "the undisputed facts demonstrate that Plaintiffs failed to

cooperate and ignored repeated requests that King Kong provide information sufficient to support

additional payments under the Policy."  First MSJ at 25.

  Peerless Indemnity next argues that it did not breach the insurance contract when it did not

pay under the Accounts Receivable Coverage Extension, because King Kong's accounts

receivables documents were not damaged in the fire.  See First MSJ at 25.  It argues that the Policy

extends coverage only to the "accounts receivables records themselves -- and does not extend to

bad debts in general."  First MSJ at 25 (citing Fact No. 4).  It further notes that the fact that actual

accounts receivable documents were not damaged is undisputed.  See First MSJ at 26.  Peerless

Indemnity further argues that it paid all the extra expense and debris removal benefits under the Policy, paying some coverage in June, 2019, after Shatto verified documents, and paying the rest of the coverage in December, 2018, after King Kong provided the rest of the documentation.  See First MSJ at 26 (citing Fact Nos. 13, 19, 25, 36, 38, 51, 59, and 70).  Thus, Peerless Indemnity argues, it did not breach the contract regarding those provisions.  See First MSJ at 26.

### 2.     The First MSJ Response.

In response, King Kong first argues that Peerless Indemnity breached the contract by not compensating Plaintiffs the "verified amounts due under the Policy."  First MSJ Response at 2. King Kong argues that Peerless Indemnity has excerpted portions of the Policy "insufficient" to determine rights.  First MSJ Response at 3.  King Kong then argues that Peerless Indemnity sent King Kong a letter on June 24, 2014, that outlined only some of the coverage available under the policy.  See First MSJ Response at 3.  It states that Shatto's testimony indicates that Peerless Indemnity could have paid for additional expenses, such as "the truck and registration for the shop truck."  First MSJ Response at 3 (citing Shatto Dep. at 107:22-25; 108:1-6).  King Kong notes that Shatto sent receipts back to Plaintiffs without accepting them as receipts, because they were not "oriented correctly."  First MSJ Response at 3-4 (citing Shatto Dep. at 37:12-20; 55:9-16)(noting that King Kong did not receive the receipts "because the email was too large to transmit").  King Kong further contends that Peerless Indemnity did not pay for receipts that it verified during a December, 2019, meeting.  See First MSJ Response at 4.  King Kong then argues that Peerless Indemnity has failed to pay additional coverage comprising of $140,000.00 business income, $50,000.00 in new location expense, and $50,000.00 to $150,000.00 for accounts receivable despite validating documentation supporting those claims.  See First MSJ Response at 3.

King Kong then summarizes the disputed facts: (i) Shatto's statements "that go to credibility"; (ii) the extent of the coverage for the losses and the extent to which that was paid; and (iii) whether Peerless Indemnity "properly" processed Defendants' claim.  First MSJ Response at 5.  King Kong next alleges that "[i]t is an undisputed material fact that Plaintiff had replacement value coverage under the Policy."  First MSJ Response at 5.  King Kong argues that Shatto "calculated the replacement costs [of vehicle lifts] in excess of policy limits that [he] reduced to an actual cash value of $133,000, then [Peerless Indemnity] claimed Plaintiffs were overpaid[, and t]hen inexplicably, after Plaintiff filed suit, Defendant then paid the difference between the replacement value of $239,833.13" and the $133,000 already paid.  First MSJ Response at 6 (citing Shatto Dep. at 157:10-14; Nilson Aff. ¶ 6)(noting that Shatto's explanation for the post-filing payment was that he continued to review the claim after the filing).

King Kong then argues that Peerless Indemnity did not pay for the covered accounts receivables, because Peerless Indemnity incorrectly defined "accounts receivables" as the "actual paper invoice" of what customers owed, and not as "the actual money" customers owed.  First MSJ Response at 6.  King Kong draws upon plain meaning, the Policy's language, and UCC § 55-9-601(g) to support their claim that Peerless Indemnity incorrectly defines "accounts receivables." First MSJ Response at 7-8.  Thus, King Kong contends, whether an account receivable is the money owed or the "actual value of the paper the account receivable is written on" is a disputed fact.  First MSJ Response at 8.

King Kong finally argues that Peerless Indemnity's contention that it paid for all debris removal that the Policy covered is false.  See First MSJ Response at 9.  It argues that Shatto stated that Peerless Indemnity paid Nilson only $150,000.00 -- $135,000.00 in business personal property and $15,000.00 in business income -- before Nilson filed the lawsuit, which contradicts Peerless

Indemnity's post-filing statement that it "paid the balance of policy limits for business personal property that included debris removal."  First MSJ Response at 9 (citing Shatto Dep. at 18:13-16).  These contradictory statements, King Kong alleges, "create a genuine issue of material fact as to what was paid to King Kong and what coverage those payments were made under."  First MSJ Response at 9.

### 2.    The First MSJ Response.

In reply, Peerless Indemnity begins by noting that the rule 56(c) of the Federal Rules of Civil Procedure and Local Rule 56.1(b) require King Kong to provide a statement of each fact they deem disputed, with each fact numbered.  See First MSJ Reply at 2-3.  Peerless Indemnity emphasizes that King Kong did not comply with Local Rule 56's requirement, because King Kong: (i) did not specifically controvert Peerless Indemnity's facts; (ii) did not "support many of their statements with adequate citations to the record"; (iii) "intermixed their responses and their own purported facts with legal arguments"; (iv) "asserted inferences to be drawn from the facts"; and (v) "mischaracterized much of the evidence."  First MSJ Reply at 5.  Thus, Peerless Indemnity argues, the Court should accept its statement of facts as undisputed and find summary judgement in Peerless Indemnity's favor.  See First MSJ Reply at 5.

Peerless Indemnity further notes that, even if the Court considers King Kong's facts, "none are sufficient to create a material disputed facts to defeat summary judgment in Defendant's favor."  First MSJ Reply at 5.  It notes that the Plaintiff gives only five facts in their factual history, none of which refer to the record.  See First MSJ Reply at 5.  It further notes that "Peerless does not disagree with these facts," all of which Peerless Indemnity included in its own statement of undisputed facts.  First MSJ Reply at 6.  It argues that the only evidence King Kong provide regarding Peerless Indemnity not paying for covered expenses and damages is Nilson's affidavit,

which is a "'self-serving'" affidavit in contravention of the United States Court of Appeals for the Tenth Circuit caselaw.  First MSJ Reply at 5-6 (quoting Garrett v. Hewlett-Packard, Co., 34 F.3d 1210, 1213 (10th Cir. 2002), and citing Ellis v. J.R.'s Country Stores, Inc., 779 F.3d 1184, 1201 (10th Cir. 2015); Bones v. Honeywell Int'l. Inc, 366 F.3d 869, 975 (10th Cir. 2004)(citation omitted)).

Peerless Indemnity walks through the affidavit, noting that Peerless Indemnity does not dispute much of the information in the affidavit, but arguing that some of the statements, such as Nilson's statement that he "submitted receipts for any replacement value and expense," are "argumentary [sic], conclusory, and not support by citations to the record."  First MSJ Reply at 7. Peerless Indemnity further notes that it does not argue that King Kong did not submit receipts, but rather that Peerless Indemnity often was unable to determine for what the receipts were and King Kong did not respond to its requests for clarification.  See First MSJ Reply (citing Fact Nos. 42, 45, 51, 59, 67, and 68).  Peerless Indemnity notes that King Kong not only proffers facts without citing support, it also proffers contradictory facts.  See First MSJ Reply at 7-8 (citing Nilson Affidavit ¶ 15, in which Nilson states that Shatto and Bukoskey ignored his request for a sit-down meeting, with Nilson Affadavit ¶ 16, in which Nilson state that Shatto met Nilson in Albuquerque to discuss the claim).  Thus, Peerless Indemnity argues, the Court should resolve the MSJ in favor of Peerless Indemnity.

Peerless Indemnity next argues that the Court should grant summary judgment in favor of Peerless Indemnity for Count I, because Peerless Indemnity paid all coverage for which King Kong provided support.  See First MSJ Reply at 8.  It notes that Peerless Indemnity provided evidence that it provided evidence of payment of substantiated coverage and that King Kong did not present any evidence that they complied with the Policy's Property Loss Conditions.  See First MSJ Reply

at 7 (citing Policy at § I(E)(3)).  Peerless Indemnity further notes that the Loss Payable provision provides for "replacement cost" coverage for the insured to receive compensation for a replacement of a damaged item instead of the item's actual cash value, only if the item was actually replaced "'as soon as reasonably possible after the loss or damage.'"  First MSJ Reply at 9 (quoting Policy § I(E)(6)).

Peerless Indemnity elaborates on its payment of the business personal property coverage, explaining that it paid King Kong $207,533.75 for business personal property coverage, even though the Policy limit was $205,378.00.  See First MSJ Reply at 9 (citing Fact Nos. 2, 70).  According to Peerless Indemnity, Lien met with Nilson to compile an inventory within a week of Lien's hire.  See First MSJ Reply at 9.  Peerless Indemnity further alleges that King Kong ignored Lien's follow-up requests for information to complete the inventory, but Peerless Indemnity regardless advanced King Kong $50,000.00 on July 15, 2014.  See First MSJ Reply at 9.  Peerless Indemnity states that, after Lien received information from Nilson, he completed the inventory in September, 2014, and issued an additional business personal property coverage payment of $50,000.00 based on the updated business personal property loss of $135,88.95.  See First MSJ Reply at 9 (citing Fact Nos. 29, 30).  Despite Shatto telling Nilson twice in October, 2014, that the Policy included replacement cost value, King Kong submitted no additional documentation, and Shatto consequently issued the remaining $35,000.00 of the business-personal-property claim and a $15,000.00 advance on the business inventory claim on November 24, 2014.  See First MSJ Reply at 9-11 (citing Fact Nos. 31, 33, 34).

Peerless Indemnity further explains that Nilson submitted receipts on June 23, 2015, but that Shatto was unable to discern for what the receipts were, and King Kong did not respond to two follow-up requests in August, 2015, and September, 2015 for further information.  See First

MSJ Reply at 10 (citing Fact Nos. 36, 38, 40, 42, 45).  Consequently, Peerless Indemnity states, Shatto closed the claim file.  See First MSJ Reply at 10 (citing Fact No. 45).  Peerless Indemnity notes that Nilson did not provide this information until a December, 2018, meeting, and that this documentation allowed Shatto to issue an additional payment to the full extent of the business personal property coverage on July 2, 2019.  See First MSJ Reply at 10 (citing Fact Nos. 67, 70).  Peerless Indemnity concludes that, because it paid the full Policy limits of business personal property coverage, and because it does not have "a contractual duty to pay more than what the insured could substantiate," it did not breach the contract.  First MSJ Reply at 10.

Peerless Indemnity then counters King Kong's argument that it breached the contract by not paying for accounts receivables under Commercial Protector Coverage Form § I(A)(6)(F).  See First MSJ Reply at 11.  It notes that the Policy "was not a credit insurance policy" and that it provided coverage for only the accounts receivables records, and not "bad debts in general."  First MSJ Reply at 11 (noting that the Policy states that it will provide coverage that results "'from direct physical loss or damage by any covered Cause of Loss to your records of accounts receivable'")(emphases in original).  Peerless Indemnity dismisses King Kong's attempts to introduce outside sources to explain the provision, because the "Policy is clear and ambiguous and should be construed and applied accordingly."  First MSJ Reply at 11.

Peerless Indemnity concludes its arguments by noting that Peerless Indemnity paid King Kong $2,071.80 for extra expenses and $3,237.58 after Shatto verified the receipts in June, 2019.  See First MSJ Reply at 11 (citing Fact No. 70).  Peerless Indemnity notes it asked for supporting documents many times, but King Kong did not provide supporting documents until December, 2018.  See First MSJ Reply at 11 (citing Fact Nos. 13, 19, 25, 36, 38,51, and 59).  Peerless

Indemnity contends that, thus, it did not breach the contract with regards to extra expenses and debris removal payments.  See First MSJ Reply at 11-12.

### 4.    **The Second MSJ.**

In the Second MSJ, Peerless Indemnity asserts that, counter to the Complaint's Count II, Peerless Indemnity did not violate the UIPA.  See Second MSJ at 6.  It argues that the Complaint "merely parrots" the UIPA language "and includes numerous subsections that have absolutely no apparent relevance," including catastrophic claims and violations of the Domestic Abuse Insurance Protection Act.  Second MSJ at 6.  Peerless Indemnity further argues that, to assert a successful UIPA violation, a party must allege either knowledge or sufficient frequency to constitute a general business practice, and that "Plaintiffs allege no facts in their Complaint and have presented no evidence in discovery to support" either of those allegations.  Second MSJ at 6 (citing § 59A-16-20).  Thus, Peerless Indemnity concludes, the Court should find that King Kong did not state a claim under § 59A-16-20(A).  See Second MSJ at 6.

Peerless Indemnity then counters the two alleged misrepresentations: (i) that Peerless Indemnity overpaid King Kong for the business personal protection coverage by paying $135,000.00 instead of the cash value of $133,000.00; and (ii) that there was not available accounts receivable coverage to pay for work that King Kong performed on customers' cars that the fire damaged.  See Second MSJ at 7.  In terms of the first misrepresentation, Peerless Indemnity argues that both statements are truthful.  See Second MSJ at 7-8 (citing Fact No. 70; First MSJ at 25-26).  Peerless Indemnity further counters King Kong's argument that Peerless Indemnity violated § 59A-16-20 (B), (D), and (N), which means that Peerless Indemnity did not "act reasonably promptly" regarding the claims, did not "affirm any coverage of claims of insureds within a reasonable time of substantiating the claims, and did not provide Plaintiffs with a "reasonable basis

relied on in the policy in relation to the facts or applicable law" in a timely manner.  Second MSJ at 8 (quoting § 59A-16-20 (B), (D), and (N)).  Peerless Indemnity asserts that the undisputed facts demonstrate that Peerless Indemnity attempted to get information from Nilson to settle the fire, that Shatto paid for coverage after he received substantiating information, and that Shatto advanced payment for business personal property losses even before substantiating the loss.   Second MSJ at 9.  Peerless Indemnity further argues that King Kong did not request any information regarding Peerless Indemnity's claim-processing practices and thus does not have grounds to allege that Peerless Indemnity's standards violated the UIPA.  See Second MSJ at 9-10.

Further, Peerless Indemnity argues, King Kong has not provided evidence that Peerless Indemnity violated § 59-16-20(G) by paying an "unreasonably low settlement," because Shatto made payments after substantiating King Kong's documents.  Second MSJ at 10.  Moreover, Peerless Indemnity contends, King Kong often did not respond to Peerless Indemnity's request for substantiating documents and, thus, no reasonable jury "could conclude that Peerless Indemnity forced King Kong to file this action."  Second MSJ at 10.  Similarly, Peerless Indemnity argues, a reasonable jury could not conclude that Shatto's offer to settle the business inventory loss claim for $27,000.00 is a violation of 59-16-20(G), because King Kong did not respond to Peerless Indemnity's request to meet regarding the offer nor did King Kong propose their own offer.  See Second MSJ at 10.  Peerless Indemnity presses that it did not violate § 59A-16-20(H) by offering King Kong "substantially less than what" the Policy provided, because it paid more than the Policy limit for business property protection and the amount it calculated for business inventory.  Second MSJ at 10.  Thus, Peerless Indemnity concludes, King Kong cannot demonstrate a violation of § 59-16-20.  See Second MSJ at 10.

Peerless Indemnity next argues that it did not violate the UPA, countering the Plaintiff's "eight so-called misrepresentations made by Peerless Indemnity."  Second MSJ at 11.  Peerless Indemnity notes that some of the alleged misrepresentations are not misrepresentations, but instead "simply rehash Plaintiff's claims under the UIPA."  Second MSJ at 11-12.  Peerless Indemnity notes that the UPA requires a misrepresentation to be in the form of a written or oral statement, but that Plaintiff alleges only one misrepresentation that is a statement as part of its UPA-violations claim.  See Second MSJ at 12.  Peerless Indemnity acknowledges that one allegation could be considered a statement -- the misrepresentation that Peerless Indemnity alleged made when it stated that the work King Kong had performed on cars under the garage keepers insurance provision, and not the accounts receivable insurance provision.  See Second MSJ at 12.  Peerless Indemnity argues that the accounts-receivables provision covers only damages to account receivables records," and thus is inapplicable to this case.   Second MSJ at 12-14 (noting that the lack of payment must be on "'unfounded'" and " 'frivolous,'" not just " 'erroneous" or "'incorrect grounds'")(citing Am. Nat'l Prop. And Cas. Co. v. Cleveland, 2013-NMCA-013, 293 P.3d 954).  Peerless Indemnity argues that King Kong does not provide any evidence that shows its "actions were based on dishonest judgement or that it failed to honestly and fairly balance its interests with those of the insured.'"  Second MSJ at 14-15.  Because Peerless Indemnity "actively, promptly and in good faith investigated the claim," it argues that the Court should conclude grant summary judgement in its favor as to Count IV.  Second MSJ at 15.

Peerless Indemnity next argues that the Plaintiff's breach-of-fiduciary-duty claim is not viable, because King Kong has not alleged that Peerless Indemnity had a fiduciary duty.  See Second MSJ at 15 (noting that the Court of Appeals of New Mexico has recognized limited circumstances in which an insurer has fiduciary duties to the insured and that this relationship does

not fall within those circumstances).  Peerless Indemnity also argues that the claim is not viable,

because New Mexico law does not recognize a breach-of-fiduciary-duty claim separate from a

bad-faith claim.  See Second MSJ at 15 (citing Grasshopper Nat. Med., LLC v. Hartford Cas. Ins.

Co., No. CIV 15-0338 JB/CEG, 2016 WL 4009834, at *30-33 (D.N.M. July 7 2016)(Browning,

J.).  Peerless Indemnity finally argues that, although New Mexico recognizes constructive fraud,

King Kong's Count V, which is a constructive-fraud claim, fails, because "there is no evidence

that Defendant had any specific or peculiar knowledge that it failed to disclose to Plaintiffs during

the adjustment process."  Second MSJ at 16-17.  Finally, Peerless Indemnity argues that the Court

should grant summary judgment in favor of Peerless Indemnity for Count VI -- punitive damages

-- because King Kong does not meet New Mexico law's requirement of demonstrating that

Peerless Indemnity had bad faith.  See Second MSJ at 18.  Thus, Peerless Indemnity concludes

that the Court should find summary judgment in its favor for Counts II-VI.  See Second MSJ at

19.

### 2. **The Second MSJ Response.**

In the Second MSJ Response, King Kong begins its arguments by stating that Peerless

Indemnity violated the UIPA, because the insurers: (i) did not "promptly investigate and process

insured's claims under [the Policy] for wind and hail damage; (ii) "unreasonably undervalued the

[wind and hail] damage"; and (iii) "insisted on an examination under oath to prolong the claim

process and dissuade insured from continuing with the claim."  Second MSJ Response at 2-3.

King Kong notes that Peerless Indemnity sent Nilson a letter in June, 2014, detailing available

coverages and that the letter did not clarify that replacement costs can exceed policy limits and did

not provide Peerless Indemnity's method of calculating the business personal property loss.  See

Second MSJ Response at 4.  It notes that the letter does not mention the loss of tools suffered by

Nilson's employees, but it "confusing[ly]" mentions damage to outdoor signs, even though no outdoor signs were damaged.  Second MSJ at 4.  King Kong further alleges that Peerless Indemnity calculated business income losses "'as if no loss occurred'" but instead calculated business income loss using the income after the fire.  Second MSJ Response at 4.   Further, Shatto "admitted" that he identified only some of the viable coverage in the June, 2014, letter, which King Kong contends "is evidence of deliberate and intentional misleading information provided by the Defendant to the Plaintiffs, that in of itself points to a [UIPA] violation."  Second MSJ Response at 4-5 (citing Def's Ex. A at 6; Shatto Dep. at 19:1-15; 67:24-25; 68:1-5).  King Kong reiterates that Shatto admitted "the truck and registration for the shop truck" was eligible to be a covered expense under the Policy and that Peerless Indemnity did not pay for that expense.  Second MSJ Response at 5 (Shatto Depo at 107:22-25; 108:1-6).  King Kong states that Shatto's "admission is almost five (5) years after the date of loss, and only now is it admitted as a covered loss."  Second MSJ Response at 5.

King Kong further argues that when Peerless Indemnity tried to settle all Nilson's remaining claims for $27,000.00, it was "tr[ying] to induce Plaintiffs to settle for far less than was fair, equitable and deserved" and "forcing them to file suit because they put their own interests above those of Plaintiffs."  Second MSJ Response at 6.  King Kong notes that, after it filed the lawsuit, Peerless Indemnity "inexplicably" paid it an additional $80,000.00.   Second MSJ Response at 6.  King Kong repeats that Peerless Indemnity violated UIPA, because Shatto did not consider "77 mb" of receipts because of the receipts' orientation, and because Peerless Indemnity did not compensate Nilson for the amounts on the receipts exchanged at the December, 2019, meeting.  Second MSJ Response at 6-7.

King Kong then argues that a holding from a United States District Court for the District of Connecticut case -- that courts should consider whether "'the defendant has engaged in the

alleged wrongful acts enough to suggest that it has a general business practice of doing so'" when determining an unfair trade practice violation – applies to this case.  Second MSJ Response at 8 (quoting <u>Belz v. Peerless Ins. Co.</u>, 46 F. Supp. 3d 157, 166 (D. Conn. 2014)).  King Kong states that, when responding to a question regarding whether "the back and forth communication over an almost 5 year period was a standard business practice," Shatto acknowledged that communication is "'the way [he] operates.'"  Second MSJ Response at 9 (quoting Shatto Dep. at 171:2-6)(alteration added).  Thus, according to King Kong, the communication is Peerless Indemnity's standing business practice and there is a genuine issue of material fact as to whether Defendant's admitted standard business practice" "is not good faith and fair dealing."  Second MSJ Response at 9.

5.      **The Second MSJ Reply.**

Peerless Indemnity begins its Second MSJ Reply by reiterating that, just like the Complaint, the Plaintiffs do not clarify what their UIPA claims are and instead merely "parrot" the language contained in the UIPA.  Second MSJ Reply at 2.  Peerless Indemnity further argues that a UIPA violation must allege either knowledge or sufficient frequency to constitute a general business practice, and that "Plaintiffs allege no facts in their Complaint and have presented no evidence in discovery to support" either of those allegations.  Second MSJ Reply at 2.  Peerless Indemnity notes that it incorporates by reference its arguments from its First MSJ Reply regarding King Kong's claims of 59A-16-20 (A), (B), (C), (D), (E), (G), and (N) violations.  <u>See</u> Second MSJ Reply at 3.

Peerless Indemnity then notes that King Kong did not address the UPA claim in its Second MSJ Response, "likely because there is no basis for such a claim against Peerless in this matter."  Second MSJ Reply at 3.  Peerless Indemnity emphasizes that the UPA requires a Plaintiff allege a

"'false or misleading oral or written statement,'" but that Plaintiffs have not alleged "any misleading, false or deceptive statement made by Peerless . . . sufficient to defeat summary judgment in Peerless's favor on this claim." Second MSJ Reply at 4 (quoting UPA). Thus, Peerless Indemnity concludes, the Court should dismiss the Complaint's Count III. See Second MSJ Reply at 4.

Peerless Indemnity next counters Plaintiffs' Count IV, which alleges that it breached the covenant of good faith and fair dealing. See Second MSJ Reply at 5. It notes that, in their response, the Plaintiffs did not address New Mexico law on the covenant of good faith and fair dealing and instead used caselaw from the District of Connecticut. See Second MSJ Reply at 5-6. Further, Peerless Indemnity argues, King Kong has not demonstrated:

> (1) why cases in Connecticut addressing unfair trade practice in Connecticut have anything to do with a claim for breach of the covenant of good faith and fair dealing in New Mexico, (2) they have failed to establish how proof of a "general business practice" applies to a claim for breach of the covenant of good faith and fair dealing, and, (3) to the extent such evidence would be relevant, they have failed to identify any other such similar insurance policies or claims upon [sic] the Court could make a comparison.

Second MSJ Reply at 6.

Peerless Indemnity then asserts that the claim could not stand under New Mexico law, because King Kong does not cite any evidence supporting that Peerless Indemnity acted on dishonest judgment and did not honestly or fairly weigh its interests against the insured's interests. See Second MSJ Reply at 6. Peerless Indemnity notes that, instead, Plaintiffs did not respond to any of the undisputed material facts, which it asserts demonstrates the difficulty it has had in working with King Kong. See Second MSJ Reply at 6-7. Peerless Indemnity further argues that all its actions had "arguable support" from the Policy and the facts, and thus, King Kong cannot conclude Peerless Indemnity's actions are " unfounded'" and " 'frivolous.'" Second MSJ Reply

at 7 (citing <u>Am. Nat'l Prop. and Cas. Co. v. Cleveland</u>, 2013-NMCA-013, 293 P.3d 954).  Peerless Indemnity further asks the Court to disregard the Plaintiff's characterization of Shatto's testimony, arguing that "a complete reading" of the deposition demonstrates that King Kong's characterization is "absurd" and "improper."  Second MSJ Reply at 7-8.   Peerless Indemnity reiterates that it actively, promptly and in good faith investigated the claim under the circumstances presented in this case,' and, thus, the Court should dismiss the Complaint's Count IV.  <u>See</u> Second MSJ Reply at 8.

Peerless Indemnity then notes that the Plaintiff's ignored its argument regarding the Complaint's Count V, which is a breach-of-fiduciary-duty claim.  <u>See</u> Second MSJ Reply at 8.  It reiterates the arguments about this Count that it made in the Second MSJ.  <u>See</u> Second MSJ Reply at 8-9.  It then asks the Court to enter judgment in its favor on Count V, because King Kong has not addressed Peerless Indemnity's arguments.  <u>See</u> Second MSJ Reply at 10.

Peerless Indemnity also emphasizes that King Kong ignored its argument regarding the Complaint's Count VI, which is a constructive-fraud claim.  <u>See</u> Second MSJ Reply at 10.  It reiterates the arguments about this Count that it made in the Second MSJ.  <u>See</u> Second MSJ Reply at 10-11.  It then asks the Court to enter judgment in its favor on Count VI, because King Kong has not addressed Peerless Indemnity's arguments.  <u>See</u> Second MSJ Reply at 11.  Peerless Indemnity then argues that the Court should dismiss the King Kong's claim for punitive damages, because New Mexico law requires a showing of at least bad faith and Kin Kong has not demonstrated any evidence of bad faith.  <u>See</u> Second MSJ Reply at 11.  Thus, Peerless Indemnity concludes, the Court should dismiss the punitive damages-claim.  <u>See</u> Second MSJ Reply at 11.

## <u>LAW REGARDING MOTIONS FOR SUMMARY JUDGMENT</u>

Rule 56(a) of the Federal Rules of Civil Procedure states: "The court shall grant summary

judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "The movant bears the initial burden of 'show[ing] that there is an absence of evidence to support the nonmoving party's case.'"  Herrera v. Santa Fe Pub. Sch., 956 F. Supp. 2d 1191, 1221 (D.N.M. 2013)(Browning, J.)(alteration in Herrera v. Santa Fe Pub. Sch.)(quoting Bacchus Indus., Inc. v. Arvin Indus., Inc., 939 F.2d 887, 891 (10th Cir. 1991)).  See Celotex Corp. v, Catrett, 477 U.S. 317, 323 (1986).

> Before the court can rule on a party's motion for summary judgment, the moving party must satisfy its burden of production in one of two ways: by putting evidence into the record that affirmatively disproves an element of the nonmoving party's case, or by directing the court's attention to the fact that the non-moving party lacks evidence on an element of its claim, "since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial."  Celotex, 477 U.S. at 323-25.  On those issues for which it bears the burden of proof at trial, the nonmovant "must go beyond the pleadings and designate specific facts to make a showing sufficient to establish the existence of an element essential to his case in order to survive summary judgment."  Cardoso v. Calbone, 490 F.3d 1194, 1197 (10th Cir. 2007)(internal quotations and brackets omitted).

Plustwik v. Voss of Nor. ASA, No. 2:11CV00757 DS, 2013 WL 1945082, at *1 (D. Utah May 9, 2013)(Sam, J.)(emphasis added).  "If the *moving* party will bear the burden of persuasion at trial, that party must support its motion with credible evidence -- using any of the materials specified in Rule 56(c) -- that would entitle it to a directed verdict if not controverted at trial."  Celotex Corp. v. Catrett, 477 U.S. at 331 (Brennan, J., dissenting)(emphasis in original).[24]  Once the movant meets this burden, rule 56 requires the nonmoving party to designate specific facts showing that

---

[24]Although the Honorable William J. Brennan, Jr., then-Associate Justice of the Supreme Court, dissented in Celotex Corp. v. Catrett, this sentence is widely understood to be an accurate statement of the law.  See 10A Charles Allen Wright & Arthur R. Miller, Federal Practice and Procedure § 2727, at 470 (3d ed. 1998)("Although the Court issued a five-to-four decision, the majority and dissent both agreed as to how the summary-judgment burden of proof operates; they disagreed as to how the standard was applied to the facts of the case.").

there is a genuine issue for trial.  See Celotex Corp. v. Catrett, 477 U.S. at 324; Anderson v. Liberty

Lobby, 477 U.S. 242, 256 (1986)("Liberty Lobby").  In American Mechanical Sols., LLC v.

Northland Piping, Inc., 184 F. Supp. 3d 1030 (D.N.M. 2016)(Browning, J.), the Court granted

summary judgment for the defendant when the plaintiff did not offer expert evidence supporting

causation or proximate causation in its breach-of-contract or breach-of-the-implied-warranty-of-

merchantability claims.  See 184 F. Supp. 3d at 1075-78.  The Court reasoned that the plaintiff

could prove neither the breach-of-contract claim's causation requirement nor the breach-of-the-

implied-warranty-of-merchantability claim's proximate-causation requirement with mere

common knowledge, and so New Mexico law required that the plaintiff bolster its arguments with

expert testimony, which the plaintiff had not provided.  See 184 F. Supp. 3d at 1067, 1073, 1075,

1079.  Without the requisite evidence, the plaintiff, the Court determined, failed to prove "an

essential element of the nonmoving party's case," rendering "all other facts immaterial."  184 F.

Supp. 3d at 1075 (internal quotation marks omitted)(quoting Plustwik v. Voss of Nor. ASA, 2013

WL 1945082, at *1).  Thus, if a plaintiff has the burden of proof, and the plaintiff has no competent

evidence, the defendant may move, without any competent evidence itself, past the plaintiff's lack

of competent evidence and secure summary judgment.  See, e.g., Celotex Corp. v. Catrett, 477

U.S. at 323-25 (providing that summary judgment is proper where a plaintiff lacks evidence on an

essential element of its case); Am. Mech. Solutions, LLC v. Northland Piping, Inc., 184 F. Supp.

3d at 1075 (granting summary judgment because plaintiff lacked evidence on causation); Morales

v. E.D. Entyre & Co., 382 F. Supp. 2d 1252, 1272 (D.N.M. 2005)(Browning, J.)(granting summary

judgment because plaintiff lacked competent evidence that defendants defectively manufactured

an oil distributor).  A conclusory assertion that the plaintiff lacks evidence is insufficient, however,

to secure summary judgment; the defendant must make some evidentiary showing that the plaintiff

lacks competent evidence.  See Halley v. Huckaby, 902 F.3d 1136, 1143 (10th Cir. 2018)(stating that summary judgment may be warranted if the movant notes a lack of evidence for an essential element of the claim).  See also 11 James Wm. Moore et al., Moore's Federal Practice § 56.40[1][b][iv], at 56-109 to -111 (3d ed. 2018).

The party opposing a motion for summary judgment must "set forth specific facts showing that there is a genuine issue for trial as to those dispositive matters for which it carries the burden of proof." Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc., 912 F.2d 1238, 1241 (10th Cir. 1990).  See Vitkus v. Beatrice Co., 11 F.3d 1535, 1539 (10th Cir. 1993)("However, the nonmoving party may not rest on its pleadings but must set forth specific facts showing that there is a genuine issue for trial as to those dispositive matters for which it carries the burden of proof."  (internal quotation marks omitted)).  Rule 56(c)(1) provides: "A party asserting that a fact . . . is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials . . . ."  Fed. R. Civ. P. 56(c)(1)(A).  It is not enough for the party opposing a properly supported motion for summary judgment to "rest on mere allegations or denials of his pleadings." Liberty Lobby, 477 U.S. at 259.  See Abercrombie v. City of Catoosa, 896 F.2d 1228, 1231 (10th Cir. 1990); Otteson v. United States, 622 F.2d 516, 519 (10th Cir. 1980)("[O]nce a properly supported summary judgment motion is made, the opposing party may not rest on the allegations contained in his complaint, but must respond with specific facts showing the existence of a genuine factual issue to be tried." (citation and internal quotation marks omitted)).

Nor can a party "avoid summary judgment by repeating conclusory opinions, allegations

unsupported by specific facts, or speculation." Colony Nat'l Ins. v. Omer, No. 07-2123-JAR, 2008 WL 2309005, at *1 (D. Kan. June 2, 2008)(Robinson, J.)(citing Fed. R. Civ. P. 56(e); Argo v. Blue Cross & Blue Shield of Kan., Inc., 452 F.3d 1193, 1199 (10th Cir. 2006)(McConnell, J.)). "In responding to a motion for summary judgment, 'a party cannot rest on ignorance of facts, on speculation, or on suspicion and may not escape summary judgment in the mere hope that something will turn up at trial.'" Colony Nat'l Ins. v. Omer, 2008 WL 2309005, at *1 (quoting Conaway v. Smith, 853 F.2d 789, 794 (10th Cir. 1988)).

To deny a motion for summary judgment, genuine factual issues must exist that "can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." Liberty Lobby, 477 U.S. at 250. A mere "scintilla" of evidence will not avoid summary judgment. Vitkus v. Beatrice Co., 11 F.3d at 1539 (citing Liberty Lobby, 477 U.S. at 248). Rather, there must be sufficient evidence on which the fact finder could reasonably find for the nonmoving party. See Liberty Lobby, 477 U.S. at 251 (quoting Schuylkill & Dauphin Improvement Co. v. Munson, 81 U.S. (14 Wall.) 442, 448 (1871)("Schuylkill")); Vitkus v. Beatrice Co., 11 F.3d at 1539. "[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable or is not significantly probative, summary judgment may be granted." Liberty Lobby, 477 U.S. at 249 (citations omitted). Where a rational trier of fact, considering the record as a whole, cannot find for the nonmoving party, "there is no 'genuine issue for trial.'" Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. at 587 (quoting First Nat'l Bank of Ariz. v. Cities Serv. Co., 391 U.S. 253, 289 (1968)).

When reviewing a motion for summary judgment, the court should keep in mind certain principles. First, the court's role is not to weigh the evidence, but to assess the threshold issue

- 45 -

whether a genuine issue exists as to material facts requiring a trial.  See Liberty Lobby, 477 U.S. at 249.  Second, the ultimate standard of proof is relevant for purposes of ruling on a summary judgment, such that, when ruling on a summary judgment motion, the court must "bear in mind the actual quantum and quality of proof necessary to support liability."  Liberty Lobby, 477 U.S. at 254.  Third, the court must resolve all reasonable inferences and doubts in the nonmoving party's favor and construe all evidence in the light most favorable to the nonmoving party.  See Hunt v. Cromartie, 526 U.S. 541, 550-55 (1999); Liberty Lobby, 477 U.S. at 255 ("The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." (citation omitted)).  Fourth, the court cannot decide any issues of credibility.  See Liberty Lobby, 477 U.S. at 255.

There are, however, limited circumstances in which the court may disregard a party's version of the facts.  This doctrine developed most robustly in the qualified immunity arena.  In Scott v. Harris, 550 U.S. 372 (2007), the Supreme Court concluded that summary judgment is appropriate where video evidence quite clearly contradicted the plaintiff's version of the facts.  See 550 U.S. at 378-81.  The Supreme Court explained:

> At the summary judgment stage, facts must be viewed in the light most favorable to the nonmoving party only if there is a "genuine" dispute as to those facts.  Fed. Rule Civ. Proc. 56(c).  As we have emphasized, "[w]hen the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts . . . .  Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'"  *Matsushita Elec. Industrial Co. v. Zenith Radio Corp.*, 475 U.S. [at] 586-587 . . . (footnote omitted).  "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. [at] 247-248 . . . .  When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.

> That was the case here with regard to the factual issue whether respondent was driving in such fashion as to endanger human life.  Respondent's version of events is so utterly discredited by the record that no reasonable jury could have believed him.  The Court of Appeals should not have relied on such visible fiction; it should have viewed the facts in the light depicted by the videotape.

Scott v. Harris, 550 U.S. at 380-81 (alterations in Scott v. Harris)(emphasis in Liberty Lobby).

The Tenth Circuit applied this doctrine in Thomson v. Salt Lake County, 584 F.3d 1304 (10th Cir.

2009), and explained:

> [B]ecause at summary judgment we are beyond the pleading phase of the litigation, a plaintiff's version of the facts must find support in the record: more specifically, "[a]s with any motion for summary judgment, '[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts[.]'" *York v. City of Las Cruces*, 523 F.3d 1205, 1210 (10th Cir. 2008)(quoting *Scott*, 550 U.S. at 380); *see also Estate of Larsen ex rel. Sturdivan v. Murr*, 511 F.3d 1255, 1258 (10th Cir. 2008).

Thomson v. Salt Lake Cty., 584 F.3d at 1312 (second alteration in Thomson v. Salt Lake Cty.,

third and fourth alterations in York v. City of Las Cruces).  "The Tenth Circuit, in *Rhoads v. Miller*,

[352 F. App'x 289 (10th Cir. 2009)(unpublished),] explained that the blatant contradictions of the

record must be supported by more than other witnesses' testimony[.]"  Lymon v. Aramark Corp.,

728 F. Supp. 2d at 1249.

## LAW REGARDING INTERPRETATION OF INSURANCE CONTRACTS

Under New Mexico Law, "insurance contracts are construed by the same principles which

govern the interpretation of all contracts." Rummel v. Lexington Ins. Co., 1997-NMSC-041, ¶ 18,

945 P.2d 970, 976 (quotation marks omitted).  In interpreting insurance policies, courts must

consider the policy as a whole. See Weldon v. Commercial Union Assur. Co., 1985-NMSC-118,

¶ 9, 710 P.2d 89, 91.  "The clauses in the policy must be construed as intended to be a complete

and harmonious instrument designed to accomplish a reasonable end."  Safeco Ins. Co. of Am.,

Inc. v. McKenna, 1977-NMSC-053, ¶ 18, 565 P.2d 1033, 1037.  "If any provisions appear questionable or ambiguous, we will first look to whether their meaning and intent is explained by other parts of the policy."  Rummel v. Lexington Ins. Co., 1997-NMSC-041, ¶ 20, 945 P.2d at 977. When insurance contracts are unambiguous, courts must construe them "in their usual and ordinary sense," Slack v. Robinson, 2003-NMSC-083, ¶ 7, 71 P.3d 514, 517, and "enforce [them] as written," Truck Ins. Exch. v. Gagnon, 2001-NMCA-092, ¶ 7, 33 P.3d 901, 903.

When interpreting contracts, "courts should not 'create ambiguity where none exists.'" United Nuclear Corp. v. Allstate Ins. Co., 2012-NMSC-032, ¶ 10, 285 P.3d at 647 (quoting City of Santa Rosa v. Twin City Fire Ins. Co., 2006-NMCA-118, ¶ 7, 143 P.3d 196, 198).  Policy terms are only deemed ambiguous when they are "reasonably and fairly susceptible of different constructions."  Knowles v. United Servs. Auto Ass'n, 1992-NMSC-030, ¶ 9, 832 P.2d at 396. Ambiguous terms must be construed against the drafter; they are "given the strongest interpretation against the insurer which they will reasonably bear."  Rummel v. Lexington Ins. Co., 1997-NMSC-041, ¶ 22, 945 P.2d at 977.  See United Nuclear Corp. v. Allstate Ins. Co., 2012-NMSC-032, ¶ 10, 285 P.3d at 648.

In construing an insurance policy, the distinction between an exclusion and a provision of coverage is very important, because it affects which party bears the burden of proof.  See Miller v. Monumental Life Ins. Co., 761 F. Supp. 2d at 1147.  The insured party initially bears the burden to show that coverage is established under a provision of coverage.  See Battishill v. Farmers Alliance Ins. Co., 2006-NMSC-004, ¶ 6, 127 P.3d 1111, 1113 The insurer then bears the burden of proving the policy excludes coverage.  See Battishill v. Farmers Alliance Ins. Co., 2006-NMSC-004, ¶ 6, 127 P.3d at 1113 (citing Eric Mills Holmes & Mark S. Rhodes, Holmes's Appleman on Insurance, § 1.10, at 43 (2d ed. 1996)("That the insurer has the burden of proof to prove no

coverage under an all-risks policy is the American rule in all states, with the possible exception of Texas")); <u>Lopez v. N.M. Pub. Schs. Ins. Auth.</u>, 1994-NMSC-017, ¶ 13, 870 P.2d 745, 749.

Insurance policy terms are frequently litigated, and courts have established consensus interpretations to many of the most common phrases.  For example, "'unlike the phrase 'the insured,' the phrase 'any insured' unambiguously expresses a contractual intent to create joint obligations and to prohibit recovery by an innocent insured.'"  <u>Axis Reinsurance Co. v. Bennett</u>, 2008 WL 2485388, at *15 (S.D.N.Y. June 19, 2008)(Lynch, J.)(quoting <u>Sales v. State Farm Fire & Cas. Co.</u>, 849 F.2d 1383, 1385 (11th Cir. 1988)).  <u>See also</u> <u>Am. Nat'l Prop & Cas. Co. v. Clendenen</u>, 238 W. Va. at 264 n.12 (collecting cases); <u>Stettin v. Nat. Union Fire Ins. Co. of Pittsburgh, Pa.</u>, 861 F.3d at 1337.  Similarly, the Court of Appeals of New Mexico has defined "arising out of" broadly, stating that the term is "ordinarily understood to mean 'originating from,' 'having its origin in,' 'growing out of' or 'flowing from.'" <u>Krieger v. Wilson Corp.</u>, 2006-NMCA-034, ¶ 14, 131 P.3d 661, 666 (quoting <u>Baca v. New Mexico State Highway Dep't</u>, 1971-NMCA-087, ¶ 14, 486 P.2d 625, 628).  In analyzing the term in an insurance contract exclusion, the Tenth Circuit surveyed New Mexico caselaw and concluded that "we have every reason to suppose that New Mexico law applies the same broad definition of arising out of in the exclusion context as in the coverage context."  <u>Am. Nat'l Prop. & Cas. Co. v. United Specialty Ins. Co.</u>, 592 F. App'x at 742.

## <u>LAW REGARDING INTERPRETATION OF INSURANCE CONTRACTS</u>

A contract is a legally enforceable promise that must consist of an offer, an acceptance, consideration, and mutual assent.  <u>See</u> N.M>R.A. Civ. UJI 130801.  A person may breach a contract by failing to perform a contractual obligation when the performance is required, unless that performance is otherwise excused.  <u>See</u> N.M.R.A., Civ. UJI 130822.  Incomplete performance

is a breach of contract.  See Cochrell v. Hiatt, 1981-NMCA-152, ¶ 6, 638 P.2d 1101, 103-04

(holding that, where the contract called for the roof to be restored to a "healthy" state and

guaranteed work for twenty-five years, because the roof leaked within the twenty-five year period,

the defendant's performance was incomplete, and the defendant was n breach of the contract).

Under New Mexico law, "[t]he elements of a breach-of-contract action are the existence of a

contract, breach of the contract, causation, and damages."  Abreu v. N.M. Children, Youth and

Families Dep't, 797 F. Supp. 2d. 1199, 1247 (D.N.M. 2011)(Browning, J.).

> [A] complaint on breach of contract must allege: (1) the existence of a valid
> and binding contract; (2) the plaintiff's compliance with the contract and his
> performance of the obligations under it; (3) a general averment of the performance
> of any condition precedent; and (4) damages suffered as a result of defendant's
> breach.

McCasland v. Prather, 1978-NMCA-098, ¶ 7, 585 P.2d 336, 338.

Applying these principles in Armijo v. N.M. Dep't of Transportation, No. CIV-080336

JB/ACT, 2009 WL 1329192 (D.N.M. Apr. 6, 2009 )(Browning, J.), the Court found that a

plaintiffs' allegations failed to state a claim for breach of contract.  In support of the breach-of-

contract claim, the plaintiff asserted that "the Department would follow state employment policies

and procedure, and that the Department terminated him in breach of those policies without just

cause."  2009 WL 1329192, at *7.  Th Court noted that the plaintiff did not "indicate what

contractual provisions or employment policies the Department breached," and did not say "to what

his employment contract entitles him or of what the Department deprived him."  2009 WL

1329192, at *7.  The Court found that there was "not enough . . . to determine whether, if taken as

true, the Complaint's allegations would support claims for breach of contract." 2009 U.S. Dist.

LEXIS 46546, 2009 WL 1329192, at *8. On the other hand, the Court has previously determined

that a pro se plaintiff sufficiently alleged that his counsel breached a contract for legal

representation by alleging that his former counsel promised to represent the plaintiff at forfeiture proceedings, that the plaintiff paid the counsel, and that the counsel failed to represent the plaintiff. See Archuleta v. City of Roswell, 898 F. Supp. 2d 1240, 2012 WL 4950324, at *16-17 (D.N.M. 2012)(Browning, J.).

"Additionally, in spite of the general bar on punitive damages for breach-of-contract cases, the Supreme Court of New Mexico has recognized that punitive damages may be recoverable under some circumstances for a breach of contract." Anderson Living Trust v. ConocoPhillips Co., LLC, 952 F. Supp. 2d 979, 2013 WL 3456913, at *42 (2013)(Browning, J.). The Supreme Court of New Mexico stated in Romero v. Mervyn's, 1989-NMSC-081, 784 P.2d 991, 109 N.M. 249: "Our previous cases clearly establish that, in contract cases not involving insurance, punitive damages may be recovered for breach of contract when the defendant's conduct was malicious, fraudulent, oppressive, or committed recklessly with a wanton disregard for the plaintiff's rights." 1989-NMSC-081, ¶ 23, 784 P.2d at 998. Punitive damages are not available when they are "predicated solely on gross negligence.  In addition to, or in lieu of, such negligence there must be evidence of an evil motive or a culpable mental state." Paiz v. State Farm Fire & Cas. Co., 1994-NMSC-079, ¶ 25, 880 P.2d 300, 308, 118 N.M. 203 (internal quotation marks omitted). The Supreme Court of New Mexico has defined "reckless disregard" sufficient for an award of punitive damages as "when the defendant knows of potential harm to the interests of the plaintiff but nonetheless utterly fails to exercise care to avoid the harm." Paiz v. State Farm Fire & Cas. Co., 1994-NMSC-079, ¶ 26, 880 P.2d at 308 (citation and secondary quotations omitted).  A defendant does not act with reckless disregard to a plaintiff's rights merely by failing "to exercise even slight care," absent the requisite "culpable or evil state of mind." Paiz v. State Farm Fire & Cas. Co.,

1994-NMSC-079, ¶ 26, 880 P.2d at 308 (citation and secondary quotations omitted). The New

Mexico Civil Jury Instructions define the elements necessary for an award of punitive damages for

a breach of contract as follows:

> If you find that     (name of party making claim for punitive damages) should
> recover compensation for damages, and if you further find that the conduct
> of     (name of party whose conduct gives rise to a claim for punitive damages) was
> [malicious], [reckless], [wanton], [oppressive], or [fraudulent], then you may award
> punitive damages.

N.M.R.A., Civ. UJI 13-861.

**ANALYSIS**

The Court first grants Peerless Indemnity's First MSJ as to Count I -- breach of contract --

of King Kong's Complaint.  The Court then moves to the Second MSJ, which it denies in part and

grants in part.  The Court denies the Second MSJ as to Counts II and IV, and it grants the Second

MSJ as to Counts III, V, and VI.

## I.     THE COURT WILL GRANT THE FIRST MSJ, BECAUSE PEERLESS INDEMNITY DID NOT BREACH THE CONTRACT.

King Kong alleges that, although it submitted appropriate documentation, Peerless

Indemnity did not pay for extra expenses, debris removal, accounts receivable, and replacement

cost of property damage, and thus, it breached the contract.  See Complaint ¶ 29, 30, at 8.  The

Court first concludes that Peerless Indemnity did not breach the policy by not paying for extra

expenses, because Peerless Indemnity paid for extra expenses.  On June 12, 2019, Peerless

concluded that it could substantiate $2,071.80 in extra expenses.  See First MSJ ¶ 70, at 21.  King

Kong does not allege anything that indicates that Peerless was required to pay for items eligible as

extra expenses that King Kong did not provide sufficient paperwork to substantiate.  See First MSJ

Response at 3 (stating only that a truck and its registration were eligible as extra expenses and not

alleging that it submitted paperwork to substantiate a truck and registration as extra expenses)(citing Excerpts from the Deposition of James Shatto at 11, filed March 24, 2020 (Doc. 52-1)("Shatto Dep.").  It alleges only that it submitted $50,000.00 for extra expenses, but it does not provide any specific cite to that $50,000.00 nor does it allege that Peerless Indemnity was able to substantiate that $50,000.00.  See First MSJ Response at 4 (stating that Peerless Indemnity admits that King Kong submitted a claim for additional coverage "that included $205,000 for business personal property, $140,000 of business income, $50,000 in extra expense for new location, and $50,000 to $150,000 for accounts receivable," although giving only a general citation to Shatto Dep. for this allegation).  Thus, Peerless Indemnity needed only to pay for the $2.071.80 in extra expenses, and not any additional eligible extra expenses that it could not substantiate.  Accordingly, Peerless Indemnity's final payment to King Kong was $87,714.44, an amount that included the $2,071.90.  Thus, the Court concludes that Peerless Indemnity paid King Kong for extra expenses and thus did not breach the contract.

Peerless Indemnity did not breach the contract by not paying for debris removal, because Peerless Indemnity paid for debris removal.  King Kong acknowledges that Peerless Indemnity has paid for "the actual cash value of . . . debris removal."  First MSJ Response at 3.  Further, King Kong cites to a portion of Shatto's deposition in which Shatto states that he believes the remainder of the business personal property loss claim that he paid after King Kong filed the lawsuit covered debris removal.  See First MSJ Response at 9 (citing Shatto Dep at 4).  King Kong cites this excerpt as evidence that Shatto gave contradictory statements when he said that he did not pay for the debris removal before the lawsuit was filed, and that he paid for the debris removal after the lawsuit was filed.  See First MSJ Response at 9.  There is no contradiction.  Peerless Indemnity has clarified that it paid for the remainder of the debris removal in June, 2019.  See First MSJ at 26.

The lawsuit was filed in February, 2019. See Notice of Removal at 1, filed March 11, 2019 (Doc. 1).  Thus, Peerless Indemnity had not paid for the debris removal before the lawsuit began, but it paid for the debris removal after the lawsuit began.  These facts coexist without contradiction. Thus, the Court concludes that, because Peerless Indemnity paid for debris removal, it did not violate the contract by not paying for debris removal.

King Kong alleges that Peerless Indemnity breached the contract, because it did not pay for accounts receivables.  See First MSJ Response at   The text of the contract, however, indicates otherwise.  The contract's plain language states that Peerless Indemnity is responsible for paying for the loss of accounts receivables due to damage to the records.  See Policy (stating that business personal property coverage can extend to accounts receivables to pay "[a]ll amounts due from your customers that you are unable to collect […], that result from direct physical loss or damage by any Covered Cause of Loss to your records of accounts receivable").  For example, if the fire damaged an account receivable record, and the customer refused to pay without proof of the account receivable, the money the customer owed that was document on the account receivable record would be eligible for coverage.  Nilson does not contend that any account receivable records were damaged.  See First MSJ Response at 1 (not disputing that fact).  King Kong argues that Peerless Indemnity contends that only the value of the paper on which the account receivable is recorded, and not the actual value of the account receivable, is covered by the Policy.  See First MSJ Response at 6-8.  The Court does not interpret Peerless Indemnity's contention in the same way that Nilson interprets it; the Court interprets the Policy not to cover the value of the paper, but to cover the value of the account receivable.  The account receivable value is covered, however, only if the insured can no longer collect, because of damage to the record.  Because King Kong does not offer any facts that support that it tried to collect on account receivables, but it was unable

to do so because of damage to the account receivable records, the Court concludes that Peerless Indemnity did not breach the contract by not paying for account receivables.

King Kong asserts that Peerless Indemnity breached the contract by not paying for business personal property coverage.  The Court concludes that Peerless Indemnity paid for business personal property coverage.  The Policy, which covers February, 2014, through February, 2015, has a business personal property coverage limit of $202,800.00.  See First MSJ ¶ 36, at 15-16 (citing Second Part of Claim at 60-64).  Peerless Indemnity paid for $207,553.75 in business personal property losses.  See First MSJ ¶ 70, at 21.  $207,553.75 is more than $202,800, the business personal property limit.  Thus, Peerless Indemnity did not breach the contract by paying King Kong more than it was entitled to receive under the Policy.

Further, King Kong gives no specific citations or other support for its allegation that Peerless Indemnity did not pay additional coverage comprising of $140,000.00 business income, $50,000.00 in new location expense, and $50,000.00 to $150,000.00 for accounts receivable despite validating documentation supporting those claims.  See First MSJ Response at 3.  Although the Court must construe the facts in King Kong's favor, because it is the responding party, it cannot construe facts that do not exist.  Further, King Kong does not provide any support for the fact that there were multiple fire inspectors, nor do they indicate how this fact connects to any claim.  Thus, Peerless Indemnity did not violate the Policy by not paying for additional coverage.

## II.   THE COURT WILL GRANT THE SECOND MSJ IN PART AND DENY IT IN PART.

The Court grants in part and denies in part the Second MSJ.  The Court will deny the Second MSJ as to Count II, which is violation of the UIPA, and Count IV, which is a breach of the covenant of good faith and fair dealing.  It will grant the Second MSJ as to Count III, which is

violations of the UPA, Count V, which is breach of fiduciary duty, and Count VI, which is constructive fraud.

### A. PEERLESS INDEMNITY HAS NOT SHOWN THAT IT DID NOT VIOLATE THE UIPA.

The Court will grant the Second MSJ as to King Kong's Count II -- violation of trade practices and fraud title of insurance code.  King Kong alleges a violation of the UIPA, then recites N.M. Stat. Ann. § 59A-16-20 (A)-(O), including sections that cannot be construed as relevant, such as N.M. Stat. Ann. § 59A-16-20 (N), violation of Domestic Abuse Insurance Protection Act, and then it lists arguments without tying the majority of the arguments to any specific provision. N.M. Stat. Ann. § 59A-16-20 (A)-(N) states:

> Any and all of the following practices with respect to claims by an insurer or other person, knowingly committed or performed with such frequency as to indicate a general business practice, are defined as unfair and deceptive practices and are prohibited:
>
> A.    Misrepresenting to insureds pertinent facts or policy provisions relating to coverages at issue;
>
> B.    Failing to acknowledge and act reasonably promptly upon communications with respect to claims from insureds arising under policies;
>
> C.    Failing to adopt and implement reasonable standards for prompt investigation and processing of insureds' claims arising under policies;
>
> D.    Failing to affirm or deny coverage of claims of insureds within a reasonable time after proof of loss requirements under the policy have been completed and submitted by the insured;
>
> E.    Not attempting in good faith to effectuate prompt, fair and equitable settlements of an insured's claims in which liability has become reasonably clear;
>
> F.    Failing to settle all catastrophic claims within a ninety-day period after the assignment of a catastrophic claim number when a catastrophic loss has been declared;

G.      Compelling plaintiffs to institute litigation to recover amounts due under policy by offering substantially less than the amounts ultimately recovered in actions brought by plaintiffs when the plaintiffs have made claims for amounts reasonably similar to amounts ultimately recovered;

H.      Attempting to settle a claim by an insured for less than the amount to which a reasonable person would have believed he was entitled by reference to written or printed advertising material accompanying or made part of an application;

I.      Attempting to settle claims on the basis of a policy that was altered without notice to, or knowledge or consent of, the insured, his representative, agent or broker;

J.      Failing, after payment of a claim, to inform the plaintiffs or beneficiaries, upon request by them, of the coverage under which payment has been made;

K.      Delaying the investigation or payment of claims by requiring an insured, claimant to submit a preliminary claim report and then requiring the subsequent submission of formal proof of loss forms, both of which submissions contain;

L.      Failing to settle an insured's claims promptly where liability has become apparent under one portion of the policy coverage in order to influence settlement under other portions of the policy coverage

M.      Failing to promptly provide an insured a reasonable explanation of the basis relied on in the policy in relation to the facts or applicable law for denial of a claim or for the offer of a compromise settlement; or

N.      Violating a provision of the Domestic Abuse Insurance Protection Act

N.M. Stat. Ann. 59A-16-20 (A)-(N).  To be generous to King Kong, the Court looks at the five facts that King Kong set forth in its Second MSJ's factual section, and cross-references them with the statute to see if any of those facts support a claim under one of N.M. Stat. Ann. § 59A-16-20's provisions.[25]  The first two facts -- that King Kong purchased the Policy from Peerless Indemnity and that King Kong suffered a fire on June 20, 2014 -- are not facts that support a violation of any

---

[25]Although King Kong adds facts in its argument section, on a summary judgment motion, the Court looks at the facts listed in the factual section.

N.M. Stat. Ann. § 59A-16-20 (A)-(N) provision.  The Court focuses on the other three facts: (i) that Peerless Indemnity hired "at least different fire investigators in succession to investigate Plaintiff's fire on June 20, 2014"; (ii) that Peerless Indemnity hired "Greer & Kirby to complete a Post-fire on-site inventory on June 24, 2014"; and (iii) that King Kong and Peerless Indemnity "engaged in an almost five (5) year back and forth communication with no full settlement and payment of the claims."  Complaint ¶¶ 3-5, at 1.  These facts could be construed as supporting a violation of N.M. Stat. Ann. § 59A-20-1 (E), which states, "Not attempting in good faith to effectuate prompt, fair and equitable settlements of an insured's claims in which liability has become reasonably clear."

The Court does not consider, however, any potential facts that are jumbled into King Kong's argument section.  The Court previously has stated:

> D.N.M.LR-Civ. 56.1(b) is designed to isolate the relevant facts and to present them in an orderly fashion to the Court, and when parties do not follow the procedures listed in this local rule, the Court may have difficulty properly determining what the relevant facts are.  Furthermore, it is not the Court's responsibility to scour the parties' evidence and filings to determine what facts are in dispute and what facts will defeat a motion for summary judgment.  See Gonzales v. City of Albuquerque, 849 F.Supp.2d 1123, 1161-62, No. 09-0520, 2011 WL 1114830, at *24 (D.N.M. Mar. 23, 2011)("[I]t is not the Court's responsibility to scour the record for evidence to defeat [a] Motion for Summary Judgment...."); Hauff v. Petterson, 755 F.Supp.2d 1138, 1150 (D.N.M.2010) (Kelly, J.)("Nor is it the court's function to 'scour the record in search of evidence to defeat a motion for summary judgment.'" (quoting Bombard v. Fort Wayne Newspapers, Inc., 92 F.3d 560, 562 (7th Cir. 1996))).  The Court will do its best to present the facts that the parties have set out in their factual sections of their briefs, or what appear to be the factual sections of their briefs, but may not be able to consider what may or may not be asserted facts set out in the argument section of the parties' filings.  The Court can think of no sound basis to distinguish between what might be arguments and what might be asserted facts when parties include those matters in the argument section of their filings but not their factual sections of their filings.

Coffey v. United States, 870 F. Supp. 2d 1202, 1209 (D.N.M. 2012)(Browning, J.).  Thus, the Court limits its analysis to the facts alleged in the factual sections of the Second MSJ briefs.

Caselaw interpreting § 59A-16-20 (E) often analyzes jointly the statutory claim with the common law tort of bad faith.  See, e.g., Hauff v. Petterson, 755 F. Supp. 2d 1138, 1148 (D.N.M. 2010)(Kelly, J.).  The Court will address the common law tort of bad faith later in the analysis, but it first looks at the statute.  Section § 59A-16-20 (E) states that that a violation occurs when the insurer knowingly, or with sufficient frequency as to be a general business practice, does not "attempt[] in good faith to effectuate prompt, fair and equitable settlements of an insured's claims in which liability has become reasonably clear."  The Supreme Court of New Mexico has clarified that "[a]ny insurer that objectively exercises good faith and fairly attempts to settle its cases on a reasonable basis and in a timely manner need not fear liability under the [this provision of] the Code."  Hovet v. Allstate Ins. Co., 2004-NMSC-010, 89 P.3d 69 (not specifying what good faith, reasonable basis, or timely manner looks like).  Insurers do not, however, need "'to settle cases they reasonably believe to be without merit or overvalued'" to comply with § 59A-16-20 (E).  Salopek, Trustee for Salopek Family Heritage Trust v. Zurich Am. Life Ins. Co., 428 F. Supp. 3d. 609, 626 (D.N.M. 2019)(quoting Hovet v. Allstate Ins. Co., 89 P.3d 69, 78 (2004)).  The Court first concludes that Peerless Indemnity not making payment during the time period of time from June, 2014, through November, 2015, does not violate § 59A-16-20 (E), because Peerless Indemnity has shown that, during that time period, it was attempting to settle the loss in a prompt, fair, and equitable manner.

The record shows that, during that time period, Nilson was repeatedly ignoring requests for information from Peerless Indemnity.  Nilson knew by July 2, 2014, at the latest, that Peerless Indemnity required him to submit tax returns and profit and loss statements, because Shatto communicated this information to him during one of their conversations in the initial weeks after the fire.  See First MSJ ¶ 13, at 12 (quoting Claim at 21).  King Kong did not, however, provide

Peerless Indemnity with this required information upon request.  The undisputed facts show that Bukoskey had to ask King Kong for the monthly profit and loss statements from April, 2014 onwards on March 18, 2015, April 14, 2015, May 14, 2015, June 11, 2015, and June 22, 2015, almost an entire year after Nilson knew he needed to submit those statements.  See First MSJ ¶¶ 37, 39 at 16.  He also asked for weekly or bi-weekly payroll summary reports on March 18, 2015, April 14, 2015, May 14, 2015, June 11, 2015, and June 22, 2015.  See First MSJ ¶¶ 37, 39 at 16. He again requested these documents in an August 17, 2015, email. See First MSJ ¶ 43, at 17 (citing Claim at 17).  Bukoskey again requested those documents during a September 15, 2015 voicemail message and follow-up email.  See First MSJ ¶ 44, at 17 (citing Claim at 17).  Before Bukoskey's final follow-up telephone conversation and e-mail with Nilson on October 13, 2015, requesting the documents, see First MSJ ¶ 46, at 17 (citing Fifth Part of Claim at 16), Shatto sent Nilson a letter advising Nilson "that the claim would be closed if a response was not received by October 27, 2015," First MSJ ¶ 45, at 17 (citing Fifth Part of Claim at 2-7).

As of November 2, 2015, Nilson had not sent the documents, and so Shatto closed the file. See First MSJ ¶ 47, at 17 (asserting this fact)(citing Claim at 4; Fifth Part of Claim at 8-11). Despite closing the file, Bukoskey still emailed Nilson on November 9, 2015 asking for the documents again.  See First MSJ ¶ 48, at 17 (asserting this fact)(citing Fifth Part of Claim at 16). Nilson requested the claim reopened more than six months later on July 20, 2016.  See First MSJ Response at 1.  In summary, Nilson did not produce sufficient documents that Peerless Indemnity requested despite a total of at least nine times over an eighteen-month period, resulting in Peerless Indemnity closing the claim.  Nilson did not ask for the claim to be reopened until eight months after Peerless Indemnity closed the claim.  Thus, there is at least two-year period where any delay in resolving the claim can be attributed to Nilson, and not to Peerless Indemnity.

Following the reopening of the claim, Nilson sent the 2015 tax returns on September 15, 2016, which resulted in Shatto emailing Nilson the business income claims' evaluation.  See First MSJ ¶ 55, at 18 (citing Fifth Part of Claim at 54); See First MSJ ¶ 57, at 18 (citing Fifth Part of Claim at 33-53).  In an October 4, 2016, email explaining how Peerless Indemnity calculated the business income claim amount, Shatto noted that Nilson had submitted some receipts that were illegible, some receipts without enough detail to identify the property, and some receipts that were not related to replacing property damaged in the fire, but were related to a specific job.  See First MSJ ¶ 58, at 18-19 (quoting Sixth Part of Claim at 2).  Shatto followed up with Nilson on or about October 26, 2016, regarding their disagreement over the business income loss claim's value, asking Nilson for documentation to support what Nilson thinks the number should be.  See First MSJ ¶ 60, at 19 (citing Fourth Part of Claim at 12).  Nilson does not submit that he followed up with documentation to support what he thinks the number should be after this call.  On May 8, 2017, Shatto tried to arrange a conference call with Nilson and Nilson's accountant to discuss the business income claim, but Nilson did not provide his accountant's availability.  See First MSJ ¶ 61, at 20 (citing Claim at 3).  Although there is no indication that a meeting regarding the business income claim ever took place, Shatto and Nilson discussed meeting to review documentation between October 30, 2017, and December 11, 2017.  First MSJ ¶ 62, at 20 (citing Sixth Part of Claim at 8-11).  Nilson does not state that this meeting ever occurred.  Thus, at first blush, it seems that the delay in payment from September 15, 2016, to July, 2019, is attributable to Nilson, because Peerless Indemnity was waiting for Nilson's receipts and for Nilson's response.

The Court notes, however, that on November 24, 2014, Peerless Indemnity advanced Nilson $15,000.00 for BI.  See First MSJ ¶ 34, at 15.  There is no indication that they paid the remainder of the claim until June 12, 2019, even though Peerless Indemnity calculated the business

loss income claim amount by October 4, 2016.  Peerless Indemnity claims to have not determined the claim amount until June 12, 2019, but it had sufficient documents in October, 2016, to make a determination.

Importantly, Peerless Indemnity does not assert sufficient facts to support its contention that it was waiting for documents from King Kong to finalize the business income claim between October, 2016, and June 12, 2019.  The record indicates that there was an initial disagreement between Bukoskey and King Kong about the business income calculation.  See Sixth Part of Claim at 12 (stating that Bukoskey "spoke to the insured and he does not agree with the amount").  The record also indicates, however that Bukoskey then explained his calculations to King Kong and suggested that King Kong show the calculations to its accountant for review, and "if [King Kong] did not agree with the calculations, then [it should] provide what [it is] claiming and the documentation to support those numbers."  Sixth Part of Claim at 12.  This follow-up suggests that it is unclear whether King Kong continued to disagree with Bukoskey after he explained the calculations, because Bukoskey gave King Kong instructions on what to do "if" it disagreed with the calculations.  Sixth Part of Claim at 12.  The end of the email supports that any further disagreement was not certain, because Buksokey notes that he is "not sure if" King Kong "will provide any documentation," suggesting that after the explanation and review with his accountant, King Kong may not have disagreed with the calculations.  Sixth Part of Claim at 12.  Although Nilson hampered Shatto's attempt to set up a conference call with Nilson and his accountant to review the business income claim by not providing his accountant's availability, this incident does not provide enough information for the Court to conclude that it is undisputed that Nilson disagreed with the business income claim at that point.  See First Part of Claim at 3.  In fact, not arranging a meeting to discuss the claim further could indicate that Nilson did agree with the calculation.

The record noted that as of May, 21, 2017, there was "recent follow-up with Insured to work on BI issues" and that Shatto was "continuing efforts to resolve last remaining issue," but it is unclear whether the recent follow-up was the phone call to arrange the meeting with the accountant or something else, and whether the remaining issue was about the BI claim or a different claim. First Part of Claim at 3.

Peerless Indemnity alleges facts that imply that it continued to ask for and wait for documentation from King Kong regarding the business income claim until December, 2018. See First MSJ ¶ 62, at 20 (citing Sixth Part of Claim at 8-11). Although the portions of the record to which Peerless Indemnity cites reference missing documentation, there is no indication that the missing documentation is related to the business income claim, rather than the business personal property claim. See Sixth Part of Claim at 8-11. Further, there is nothing that demonstrates that the documentation provided at the December 13, 2018, meeting, was related to the business income claim, and the documentation that Nilson sent to Peerless Indemnity on December 17, 2018, seems to be related to the business personal property claim. Thus, there is no indication that Peerless Indemnity received any new information regarding the business income claim from King Kong between October, 2016, and its payment on June 12, 2019. Indeed, King Kong evaluated the business income claim in October, 2016, as $27,027, see Sixth Part of Claim at 4, and on June 12, 2019 as $27,027, see First MSJ ¶ 70, at 21. Nor has Peerless Indemnity demonstrated that it needed further action or documentation from King Kong in order to resolve the claim. Thus, there are too many factual holes and ambiguities to conclude Peerless Indemnity has demonstrated that it attempted in good faith to resolve King Kong's business income claim in a prompt, fair, and equitable manner from October, 2016, through June, 2019. The Court thus denies summary judgment on Count II.

### B.     PEERLESS INDEMNITY HAS DEMONSTRATED THAT IT DID NOT VIOLATE THE UPA.

The Court will grant the Second MSJ as to King Kong's Count III -- violation of the UPA, N.M. Stat. Ann. § 57-12-3, which prohibits "unfair or deceptive trade practices and unconscionable trade practices in the conduct of any trade or commerce."  N.M. Stat. Ann. § 57-12-3.  The UPA defines "unfair or deceptive trade practice" as

> <u>a false or misleading oral or written statement, visual description, or other representation of any kind</u> knowingly made in connection the sale, lease, rental or loan of goods or services or in the extension of credit or in the collection of debts by a person in the regular course of the person's trade or commerce, that may, tends to or does deceive or mislead any person

N.M. Stat. Ann. § 57-12-2 (emphasis added).  Thus, to state a § 57-12-3 violation, a party must allege a false or misleading representation of some kind.  Nilson alleges eight different ways in which Peerless Indemnity violated § 57-12-3:

a.     Delaying investigation of Plaintiff's claims for 4 years.

b.     Failing to inform Plaintiff under what provision of the policy to which the initial approximately $135,000 payment was made.

c.     Attempting to settle the claim for $27,000, which was far less than what a reasonable settlement should have been based upon the actual coverage admitted by Defendant's agent.

d.     Failing to settle Plaintiff's claim, when liability had become apparent under multiple portions of the policy.

e.     Informing Plaintiff that coverage for automobiles Plaintiff had worked on and had not been paid only fell under the "garage keepers" insurance provision and not the "Accounts receivable" insurance provision.

f.     Failing to identify other provisions of the "Policy" that afforded additional coverage amounts or additional coverage.

g.     Prevented Plaintiff from being advised of the payments made under the 'garage keeper's' provision and subsequent lawsuits between Plaintiff's clients and Defendants

h.      Rejecting Plaintiff's proof of loss receipts without performing a good faith investigation and/or meeting with Plaintiff to verify the veracity of the receipts.

Complaint ¶ 41, at 11.  The Court casts aside allegations (a), (b), (c), (d), (f), (g), and (h), because none of those are representations of any kind "made in connection the sale, lease, rental or loan of goods or services or in the extension of credit or in the collection of debts."  N.M. Stat. Ann. § 57-12-2.  The only allegation that could be considered a "representation" is the allegation that Peerless Indemnity told King Kong that coverage for cars that King Kong "had worked on and had not been paid only fell under the 'garage keepers' insurance provision and not the 'Accounts receivable' insurance provision."  Complaint ¶ 41 (b), at 11.  The Court has already discussed coverage under the Policy's Account Receivables provision covers only accounts receivable documents that are damaged and result in customer's refusal to pay for the accounts receivable.  Thus, this statement is not, as a matter of law, false or misleading and thus the Court grants summary judgment in Peerless Indemnity's favor on this claim.

## C.      PEERLESS INDEMNITY HAS NOT DEMONSTRATED THAT IT DID NOT BREACH THE COVENANT OF GOOD FAITH AND FAIR DEALING.

Peerless Indemnity asks the Court to grant summary judgment in its favor and dismiss King Kong's claim that Peerless Indemnity breached the covenant of good faith and fair dealing implied in their insurance contract.  See Second MSJ at 12.  New Mexico recognizes an implied covenant of good faith and fair dealing in insurance contracts.  See Salas v. Mountain States Mut. Cas. Co., 145 N.M. 542 ("'Thus, with insurance contracts, as with every contract, there is an implied covenant of good faith and fair dealing that the insurer will not injure its policyholder's right to receive the full benefits of the contract.'")(quoting Dairyland Ins. Co. v. Herman, 1998-NMSC-005, ¶ 12, 124 N.M. 624); Raja v. Ohio Sec. Ins. Co., 305 F. Supp. 3d 1206, 1250 (D.N.M.

2018)(Browning, J.)).  This "'covenant requires that neither party do anything which will deprive the other of the benefits of the agreement.'"  Salas v. Mountain States Mut. Cas. Co., 2009-NMSC-005, ¶ 13, 202 P.3d 801 (quoting Watson Truck & Supply Co. v. Males, 2009-NMSC-005, ¶ 60, 801 P.2d 639, 642 (1990).  A question whether the insurer was acting in bad faith is generally one for the jury.  See Montoya v. Loya Ins. Co., No. CV 18-590 SCY/KBM, 2019 WL 1116010, at *7 (D.N.M. Mar. 11, 2019)(Yarborough, M.J.).  To survive the summary-judgment stage, the insurer must demonstrate that it "honestly and fairly balance[d] its own interests" with the insured's interests.  Sloan v. State Farm Mut. Auto. Ins. Co., 135 N.M. 106, 85 P.3d 230, 237; see generally New Mexico Uniform Jury Instructions–Civil §§ 13-1701 to 13-1718.  If an insurer denies or delays payment for "'frivolous or unfounded reasons,'" that insurer is acting in bad faith.  Hauff v. Petterson, 755 F. Supp. 2d at 1145)(quoting Sloan v. State Farm Mut. Auto. Ins. Co, 135 N.M. 106, 85 P.3d 230, 236).  The Supreme Court of New Mexico defined "unfounded" in Jackson Nat'l Life Ins. Co. v. Receconi:

> "Unfounded" in this context does not mean "erroneous" or incorrect"; it means essentially the same thing as "reckless disregard," in which the insurer "*utterly* fail[s] to exercise care for the interests of the insured in denying or delaying payment on an insurance policy." Jessen v. Nat'l Excess Ins. Co., 108 N.M. 625, 628, 776 P.2d 1244, 1247 (1989)(emphasis added). It means an utter or total lack of foundation for an assertion of nonliability—an arbitrary or baseless refusal to pay, lacking any arguable support in the wording of the insurance policy or the circumstances surrounding the claim. It is synonymous with the word with which it is coupled: "frivolous."

1992-NMSC-019, ¶ 56, 827 P.2d 118, 134 (citing Jessen v. Nat'l Excess Ins. Co., 776 P.2d 1244, 1247 (emphasis added).  See Sloan v. State Farm Mut. Auto. Ins. Co., 2004-NMSC-004, ¶ 18, 85 P.3d 230, 237.  Although Peerless Indemnity implies that it delayed payment on the business income claim, because it was waiting for documentation from King Kong, see First MSJ ¶ 62, at 20, the record does not bear this out and instead suggests that it was waiting for documentation

regarding the business personal property claim, see Sixth Part of Claim at 8-11.  Peerless Indemnity

does not explain the gap in its last mention of the business income claim in May, 21, 2017, see

First Part of Claim at 3, and paying the claim in June, 2019, see First MSJ ¶ 70, at 21.  Thus, it

cannot be said that Peerless Indemnity demonstrated that it "honestly and fairly balance[d] its own

interests" at this stage.  Sloan v. State Farm Mut. Auto. Ins. Co., 135 N.M. 106, 85 P.3d at 237.

Because Peerless Indemnity has not carried its burden, particularly in light of the preference for a

jury to decide questions of good faith, the Court denies summary judgment on this claim.

###   D.   PEERLESS INDEMNITY DOES NOT HAVE A FIDUCIARY DUTY TO KING KONG.

Peerless Indemnity states that, counter to King Kong's assertions, New Mexico law does

not permit King Kong to bring an independent breach-of-fiduciary-duty cause of action.  See

Second MSJ at 15.  Peerless Indemnity argues that New Mexico law does not recognize a fiduciary

relationship between an insurer and an insured in the insurance context independent of a bad-faith

claim.  See Second MSJ at 15 (citing Chavez v. Chenoweth 1976-NMCA-076, 553 P.2d 703).[26]

---

[26]In Stoner v. New York Life Insurance Co., 311 U.S. 464 (1940), the Supreme Court of
the United States explained that "in cases where jurisdiction rests on diversity of citizenship,
federal courts, under the doctrine of Erie Railroad v. Tomkins . . . must follow the decision of
intermediate state courts in the absence of convincing evidence that the highest court of the state
would decide differently."   311 U.S. at 467.   See Anderson Living Trust v. ConocoPhillips
Company, LLC, 2013 WL 11549178, at *8 (D.N.M. Sept. 18, 2013)(Browning, J.).  "In particular,
this is true where the intermediate state court has determined the precise question in issue in an
earlier suit between the same parties, and the highest court of the state has refused review." Stoner
v. New York Life Ins. Co., 311 U.S. at 467.  See Adams-Arapahoe Joint School Dist. No. 28-J v.
Continental Ins. Co., 891 F.2d 772, 774 (10th Cir. 1989)("With respect to issues which the
Colorado Supreme Court has not addressed, we may consider all available resources, including
Colorado appellate court decisions, other state and federal decisions, and the general trend of
authority, to determine how the Colorado Supreme Court would construe the law in this case.").
As the Tenth Circuit explained in Wade v. Emcasco Insurance Co., 483 F.3d 657 (10th Cir. 2007):

In cases arising under diversity jurisdiction, the federal court's task is not to reach
its own judgment regarding the substance of the common law, but simply to

To determine whether New Mexico law permits an independent breach-of-fiduciary-duty cause of action, the Court must "follow the most recent decisions of the state's highest court"; (ii) "seek guidance from decisions rendered by lower courts in the relevant state . . . and the general weight and trend of authority in the relevant area of law"; (iii) look at "appellate decisions in other states with similar legal principles"; and (iv) examine "district court decisions interpreting the law of the state in question."   Wade v. EMCASCO Ins., 483 F.3d 657, 665-66 (10th Cir. 2007)(citing Wankier v. Crown Equip. Corp., 353 F.3d 862, 766 (10th Cir. 2003); Progressive Cas. Ins. Co. v. Engemann, 268 F.3d 985, 988 (10th Cir. 2001); United States v. DeGasso, 369 F.3d 1139, 1148 (10th Cir. 2004); Sapone v. Grand Targhee, Inc., 308 F.3d 1096, 1100, 1004-05 (10th Cir. 2002), and MidAmerica Constr. Mgmt., Inc. MasTec N. Am., Inc., 436 F.3d 1257, 1262 (10th Cir. 2006)). Because there are no Supreme Court of New Mexico cases directly on point, the Court looks at Supreme Court of New Mexico cases that may provide insight into how the Supreme Court of New Mexico would rule, and the Court combs through these other sources to predict how the Supreme Court of New Mexico rule.

---

ascertain and apply the state law. The federal court must follow the most recent decisions of the state's highest court. Where no controlling state decision exists, the federal court must attempt to predict what the state's highest court would do. In doing so, it may seek guidance from decisions rendered by lower courts in the relevant state, appellate decisions in other states with similar legal principles, district court decisions interpreting the law of the state in question, and the general weight and trend of authority in the relevant area of law. Ultimately, however, the Court's task is to predict what the state supreme court would do. Our review of the district court's interpretation of state law is de novo.

483 F.3d at 665-66 (internal citations and quotation marks omitted).  Thus, over time, the Tenth Circuit has broadened the range of factors in determining what the state supreme court would do.

Although it is a case from the Court of Appeals of New Mexico, and the Court's job is to predict how the Supreme Court of New Mexico, and not the Court of Appeals of New Mexico, would rule, Chavez v. Chenoweth, 1976-NMCA-076, ¶ 41, 553 P.2d at 710, is the case most on point.  In that case, the plaintiff alleged that State Farm "was acting in a fiduciary relationship with the Plaintiff and that by its actions as alleged aforesaid, breached such relationship."  1976-NMCA-076, ¶ 41, 553 P.2d at 710.  The Court of Appeals of New Mexico concluded that the plaintiff had not sufficiently alleged a fiduciary relationship and that, even if there had been a fiduciary relationship, such a relationship results in a duty imposed upon the insurer to deal in good faith with its insured -- the same duty resulting from a contractual relationship.  See 1976-NMCA-076, ¶¶ 42-46, 553 P.2d at 710.  In reaching this conclusion, the Court of Appeals of New Mexico first explained: "The fact that State Farm insured plaintiff did not create a fiduciary relationship."  1976-NMCA-076, ¶¶ 42-46, 553 P.2d at 710.  It elaborated that "[s]omething more than the fact of the insurance relationship is required before a fiduciary relationship results."  1976-NMCA-076, ¶ 42, 553 P.2d at 710 (noting three cases in which an insurer took an additional action beyond entering a contract with the insured to create a fiduciary relationship).  See also Williamson v. Metropolitan Property and Casualty Ins. Co., No. CIV 15-958 JCH/LF, 2017 WL 3098258, at *14 (D.N.M. June 14, 2017)(Herrera, J.)(stating the context of New Mexico law that "[a]n insurance relationship alone, however, does not create a fiduciary duty; something more is needed")(citing Azar v. Prudential Ins. Co. of Am., 2003-NMCA-062, ¶ 54, 68 P.3d 909; Chavez v. Chenoweth, 1976-NMCA-076, ¶ 42).  It then stated:

> When a liability insurance company, by the terms of its policy, obtains the power to determine whether an offer of compromise of a claim should be accepted or rejected, it creates a fiduciary relationship between it and its insured. American Fidelity & Casualty Co. v. G. A. Nichols Co., 173 F.2d 830 (10th Cir. 1949). When an insurance company acts on behalf of the insured in the conduct of litigation and

the settlement of claims, it assumes a fiduciary relationship. American Fidelity & Cas. Co. v. All American Bus Lines, 179 F.2d 7 (10th Cir. 1949). When an insurance company advises its insured that it is not necessary to employ counsel to collect the insurance or secure benefits under the policy and invites the insured to communicate with the company, it assumes a duty not to deceive its insured. Stark v. Equitable Life Assur. Soc., 205 Minn. 138, 285 N.W. 466 (1939).

Each of the three cases cited in the preceding paragraph involved the relationship of the insurer and insured. Those cases refer to a fiduciary relationship. What resulted from this relationship? It was the duty of the insurer to deal in good faith with its insured. That duty exists in New Mexico. American Employers' Insurance Co. v. Crawford, supra.

1976-NMCA-076, ¶ 43, 553 P.2d at 710 (emphasis added).  The Court of Appeals of New Mexico concluded that plaintiff had stated a claim for breach of the good faith duty, but that "[t]he claim of a fiduciary relationship fails to state any additional claim upon which relief can be granted." 1976-NMCA-076, ¶¶ 45-46, 553 P.2d at 710.  Thus, the Court of Appeals of New Mexico limited the definition of any inherent fiduciary obligation[27] from the insurer to the insured to the duty of good faith and fair dealing that is inherent to any contract. 1976-NMCA-076, ¶ 36, 553 P.2d at 709 (stating that the "'bad faith dealing rule'" applies between an insurer and insured).

Two Supreme Court of New Mexico cases buttress the Court of Appeals of New Mexico's ruling, although neither directly addresses the issue.  In Allsup's Convenience Stores, Inc. v. The North River Insurance Co., the Supreme Court of New Mexico approvingly cited Chavez v. Chenoweth as holding that the "relationship between insurer and insured imposes fiduciary

---

[27]The "fiduciary obligation" language muddles the analysis, because it implies the existence of a fiduciary relationship.  This offhand characterization is common among courts.  See Douglas R. Richmond Trust Me: Insurers Are Not Fiduciaries to Their Insured, 88 Ky. L. J. 1, 2-3 (noting that "many" courts that characterize the insurer-insured relationship as a fiduciary relationship "do so only in the most cursory fashion and with little thought and reasoning"). Because the Court of Appeals of New Mexico makes several point blank statements that there is no inherent fiduciary relationship between the insurer and the insured but a duty of good faith from the insurer to the insured, the Court concludes that the use of "fiduciary" to describe the duty of good faith is not meant to indicate the presence of a fiduciary relationship.

obligation on insurer to deal with the insured in good faith in matters pertaining to the performance of the insurance contract."  1999-NMSC-006, ¶ 37, 976 P.2d at 15.  This statement indicates that the Supreme Court of New Mexico would agree that the relationship between and insurer and insured has one inherent duty:  good faith.  The issue with this case is the use of the word "fiduciary."  A good-faith duty to perform the contract does not arise out of a fiduciary relationship, but is inherent in every contract.  See Salas v. Mountain States Mut. Cas. Co., 2009-NMSC-005, ¶ 13, 202 P.3d 801. As discussed, supra, the Supreme Court of New Mexico is far from the only court to use the term "fiduciary" in the context of an insured and an insurer without imposing a fiduciary relationship on the insurer and the insured.   Further, a fiduciary relationship would naturally include a duty of good faith, and so if the Supreme Court intended "fiduciary obligation" to mean "fiduciary relationship," it would not have needed to specify the duty of good faith.   Thus, because the language in this case is limited to a good faith duty, the Court construes the statement as supporting the conclusion that a good faith duty is, without more, all that arises out of an insurer-insured relationship.

The second Supreme Court of New Mexico case is Dairyland Ins. Co. v. Herman, 1998-NMSC-005, 954 P.2d 56,[28] which bolsters the Court's conclusion in Grasshopper Nat. Med., LLC

---

[28]Douglas R. Richmond makes another argument that Dairyland Insurance Co. v. Herman demonstrates that the Supreme Court of New Mexico does not think that an insured-insurer's relationship, by its nature, is a fiduciary relationship:

> In Dairyland Insurance Co. v. Herman, the New Mexico Supreme Court stated that an insurer "should place itself in the shoes of the insured" and act as though it alone would bear any judgment.  Were another court to read only that passage, it might conclude that an insurer must act as a fiduciary when evaluating settlement.  What the Dairyland court actually held, however, was that while an insurer's good faith evaluation of the risks and benefits attending settlement offers is generally accorded judicial deference, the insurer's judgment should receive less deference where "there is a substantial likelihood of a recovery that exceeds policy

v. Hartford Cas. Ins. Co., 2016 WL 4009834, by describing the insured-insurer relationship in a

way that is incompatible with assuming the insured-insurer relationship is a fiduciary relationship.

In this case, the Supreme Court of New Mexico described the insurer's duty to act in good faith as

a "duty to treat its interest and the interests of its insured equally." Dairyland Ins. Co. v. Herman,

1998-NMSC-005.  This description is inconsistent with a fiduciary relationship, which would

require the insured to prioritize the insured's interests, and not merely treat the insured's interests

equal to its own interests.  See GCM, Inc. v. Ky. Cent. Life Ins. Co., 1997-NMSC-052, ¶ 23, 947

---

limits."  When a third-party claimant makes a firm and reasonable offer to settle
what is clearly an excess claim within policy limits, the insurer's duty of good faith
and fair dealing may well require it to settle.  If the insurer breaches its duty of good
faith by refusing to accept a reasonable settlement offer within policy limits when
there is a substantial likelihood of an excess verdict, the insurer will be liable for
the entire amount of any subsequent judgment.

The Dairyland court did not state that an insurer must always accept a third-
party claimant's settlement offer, or that it is forbidden to consider *18 its own
interests when weighing settlement.  The court held only that an insurer cannot
gamble with the insured's money. An insurer that is willing to bet against an excess
verdict must back its play with its own money.

In short, an insurer's obligation to pay an excess verdict when it rejects a
policy limits settlement offer is not linked to a fiduciary duty.  An insurer that gives
its insured's interests equal consideration before rejecting a policy limits offer in
what is clearly an excess liability case realistically bears the same liability if that
decision was made without any regard for the insured's interests.  An insurer may
incur liability in excess of its policy limits without acting in bad faith.  Prioritizing
the insured's interests will seldom change the ultimate outcome.  Given that a failure
to settle will typically leave the insurer liable for the full amount of any subsequent
excess verdict, it is in all likelihood an insurer's consideration of its own interests
that causes it to settle within policy limits when faced with probable excess liability.
To behave otherwise is to render meaningless the policy limits for which it
bargained. An insurer's decision to accept a policy limits settlement offer is more
an act of economic self-interest than an attempt to protect the insured

Douglas R. Richmond, Trust Me: Insurers Are Not Fiduciaries to Their Insureds, 88 Ky. L.J. 1,
17-19 (2000).

P.2d 143, 150 ("'A fiduciary is obliged to act primarily for another's benefit *in matters connected with such undertaking*.'")(quoting <u>Kueffer v. Kueffer</u>, 791 P.2d 461, 464)(emphasis added in <u>GCM, In. v. Ky. Cent. Life Ins. Co.</u>, and not <u>Kueffer v. Kueffer</u>).  This case is somewhat at odds with <u>Allsup's Convenience Stores, Inc. v. The North River Insurance Co.</u>, which characterizes the duty of good faith as a "fiduciary obligation."  As discussed, supra, however, some courts have described the duty of good faith in the insurance context as "fiduciary," without imposing a fiduciary relationship on the parties.  Douglas R. Richmond, <u>Trust Me: Insurers Are Not Fiduciaries to Their Insureds</u>, 88 Ky. L.J. 1, 17-19 (2000)(citing <u>Johansen v. California State Auto. Inter-Ins. Bureau</u>, 538 P.2d 744, 748 (Cal. 1975)).  Moreover, in <u>Allsup's Convenience Stores, Inc. v. The North River Insurance Co.</u>, the Supreme Court of New Mexico clarifies that the "fiduciary obligation" is just acting in good faith in context of performance of the contract, and not some heightened responsibility beyond the duty of good faith and fair dealing inherent in all contracts.  Thus, the Court construes <u>Dairyland Ins. Co. v. Herman</u> to support its conclusion that the Supreme Court of New Mexico would not elevate an insured to a fiduciary merely because of an insurance contract, and thus would not recognize a breach-of-fiduciary-duty cause of action in the insurance context.

Because there are no Supreme Court of New Mexico cases on point, the Court looks to the other sources to glean how the Supreme Court of New Mexico would rule on this issue.  <u>See</u> <u>Grasshopper Natural Medicine, LLC v. Hartford Casualty Ins. Co.</u>, 2016 WL 4009834, at *32.  In <u>Grasshopper Natural Medicine, LLC v. Hartford Casualty Insurance Co.</u>, the Court looked at New Mexico's Uniform Jury Instructions governing bad-faith claims contains a jury instruction entitled "'Breach of Fiduciary Duty -- No Instruction Drafted.'"  2016 WL 4009834, at *31 (quoting N.M.R.A. Civ. UJI 13-1708). Nevertheless, although New Mexico's Uniform Jury Instructions

can be challenged as incorrect statements of law, "'[t]he Supreme Court of New Mexico's adoption of uniform jury instructions proposed by standing committees of the Court establishes a presumption that the instructions are correct statements of law.'" Grasshopper Natural Medicine, LLC v. Hartford Casualty Ins. Co., 2016 WL 4009834, at *31 n.18 (quoting Back v. ConocoPhillips Co., 2012 WL 6846397, at *15 n.2 (D.N.M. Aug. 31, 2012)(Browning, J.)(citing State v. Wilson, 1994-NMSC-009, ¶ 5, 867 P.2d 1175, 1178))

The committee commentary to N.M. UJI 13-1708 states:

> While the relationship between insurer and insured imposes a fiduciary obligation on the insurer to deal with the insured in good faith in matters pertaining to performance of an insurance contract, no cause of action, apart from the action for bad faith, exists for the breach of this duty.  Chavez v. Chenoweth, 89 N.M. 423, 553 P.2d 703 (Ct. App. 1976).  The fiduciary obligation allows the award of punitive damages in insurance cases under a more relaxed standard.  See UJI 131718; Romero v. Mervyn's, 109 N.M. 249, 255, 784 P.2d 992, 998 n.3 (1989).

N.M.R.A. Civ. UJI 13-1708 cmt.   With respect to Uniform Jury Instructions committee commentary, the Supreme Court of New Mexico has explained:

> In any event, the committee comment is not the law of New Mexico, see O'Hare v. Valley Utils., Inc., 89 N.M. 105, 112, 547 P.2d 1147, 1154 (Ct. App.)(stating that committee comments are not equivalent to the directions for use), rev'd on other grounds, 89 N.M. 262 550 P.2d 274 (1976), and comments must stand on their own merit without implied endorsement of this Court.

Cress v. Scott, 1994-NMSC-008, ¶ 6, 868 P.2d 648, 650-51.  The Court concludes that the committee commentary to N.M.R.A., Civ. UJI 13-1708 -- explaining that no cause of action, apart from an action for bad faith, exists for the breach of fiduciary duties in the insurance context -- "stands on its own merit in that it properly articulates the Court of Appeals of New Mexico's decision in Chavez v. Chenoweth."  Grasshopper Natural Medicine, LLC v. Hartford Casualty Ins. Co., 2016 WL 4009834, at *32.  Although it does not have the implied endorsement of this Court, it lends a little "'weight" to the general trend of the law and supports the Court's 2016 and current

prediction of what the Supreme Court of New Mexico would do.  Wade v. EMCASCO Ins., 483

F.3d 657, 665-66 (10th Cir. 2007).   Other courts have agreed with the Court's 2016 conclusion.

See Williamson v. Metropolitan Property and Casualty Ins. Co., 2017 WL 3098258, at *14 (stating

that Chavez v. Chenoweth, Allsup's Convenience Stores, Inc. v. North River Ins. Co., 1999-

NMSC-006, 976 P.2d 1, and Azar v. Prudential Ins. Co. of America, 2003-NMCA-062, 68 P.2d

909 "lay the framework of an insurer's duties to its insured," which is that "an insurance

relationship alone, however, does not create a fiduciary duty")(Herrera, J.); Lucero v. Allstate Ins.

Co., No. CIV 15-1098 LH/KBM, 2016 WL 7437142, at *2 (D.N.M. Nov. 7, 2016)(adopting

Grasshopper National Medicine, LLC's   reasoning and conclusion as its own)(quoting

Grasshopper Nat. Med., LLC v. Hartford Cas. Ins. Co., 2016 WL 4009834, at *30-33).

   The Court acknowledges that it is primarily relying on Chavez v. Chenoweth, and it admits

its hesitation to rely so closely on a Court of Appeals of New Mexico case from 1976.  Although

the Court can rely on a Court of Appeals of New Mexico case in the absence of controlling

Supreme Court of New Mexico caselaw, this reliance would be undermined by "convincing

evidence" that the Supreme Court of New Mexico would decide the case differently.[29]  It does not,

however, see any evidence that would lead the Court to believe that the Supreme Court of New

Mexico would conclude there is an independent cause of action for a breach-of-fiduciary-duty

---

   [29]Looking at the Supreme Court of New Mexico's rate of reversal provides some guidance
in determining the overall level of agreement between the two levels of courts.  The Court of
Appeals of New Mexico takes about 900 cases each year.  Of the approximately fifty cases that
the Supreme Court of New Mexico takes every year, about half of the cases are civil cases and
about half of the cases are criminal cases.  Between 2010 and 2020, the Supreme Court has had
532 cases, and it has reversed 183 of them. A total of eighty-nine of the cases reversed were
criminal cases and ninety-four of the reverse cases were civil cases. Overall, the Supreme Court
of New Mexico reversed thirty-one percent of all criminal cases and thirty-seven percent of all
civil cases.

claim in the insurance context.  See Grasshopper Natural Medicine, LLC v. Hartford Casualty Ins. Co., 2016 WL 4009834, at *32)(stating that "there is an 'absence of convincing evidence' that the Supreme Court of New Mexico would decide this issue differently")(quoting Stoner v. N.Y. Life Ins. Co., 311 U.S. at 467)).  The Uniform Jury Instructions, Chavez v. Chenoweth, Allsup's Convenience Stores, Inc. v. The North River Insurance Co., Dairyland Ins. Co. v. Herman, 1998-NMSC-005, 954 P.2d 56, and other judges within the United States District Court for the District of New Mexico all are evidence that supporting the Court's prediction, and there is no evidence undermining the Court's prediction.  Thus, although the Court would not rely on a Court of Appeals of New Mexico case if there was convincing evidence that the Supreme Court of New Mexico would decide the issue differently, here there is an "absence of convincing evidence" that the Supreme Court of New Mexico would decide the issue differently, and thus, the Court can rely on Chavez v. Chenoweth when making its prediction that, because there is no inherent fiduciary relationship between an insurer and an insured without further action on the insurer's behalf, there is no separate cause of action for breach of that fiduciary duty.

There is another reason that the Court is comfortable concluding that the Supreme Court of New Mexico would not recognize a cause of action for a breach of fiduciary duty in the insurance context.  That Chavez v. Chenoweth was decided in 1976 also cuts in favor of the Court relying on it -- the Supreme Court of New Mexico, through the UJI, has been aware that its bar and the federal courts have not been bringing breach-of-fiduciary claims in the context of insurance.  Against this backing, the Court is reluctant to change when the status quo that has existed for many years, and the Supreme Court of New Mexico is unlikely to change the analysis the foreseeable future.

- 76 -

Finally, while the Court, a federal court, under <u>Erie</u> is not allowed to impose its own views of what the law should be, the Court notes that finding a fiduciary duty in the insurance context and recognizing a cause of action for bringing a fiduciary duty would not be a good idea.  While insurance companies owe their insureds special duties, they are contractual, commercial transactions.  The law should be slow to impose fiduciary duties in the commercial context where parties have not bargained for such a relationship.

### E.  KING KONG HAS NOT SHOWN THAT PEERLESS INDEMNITY COMMITTED CONSRUCTIVE FRAUD.

The Court denies King Kong's Count VI -- constructive fraud, which King Kong claims arises out of Peerless Indemnity's duty to King Kong from the insurance policy and Peerless Indemnity's allegedly false statements to King Kong that "all of the insurance coverage had been exhausted and that [King Kong] had actually been overpaid."  Complaint ¶ 56, at 13.  <u>See</u> Complaint ¶ 54, at 13.  In the factual section of its brief, however, King Kong does not allege any facts that would support a claim of constructive fraud.  <u>See</u> <u>Coffey v. United States</u>, 870 F. Supp. 2d at 1209 ("[I]t is not the Court's responsibility to scour the parties' evidence and filings to determine what facts are in dispute and what facts will defeat a motion for summary judgment.")  <u>See</u> <u>Gonzales v. City of Albuquerque</u>, 849 F. Supp. 2d at 1161-62.  Thus, the Court will deny this claim.

**IT IS ORDERED** that: (i) the Motion for Summary Judgment on Count I of the Complaint, filed March 6, 2020 (Doc. 46), is granted; (ii) the Opposed Motion for Summary Judgment on Counts II through VI of the Complaint, filed March 6, 2020 (Doc. 47)("Second MSJ")is granted as to Counts III, V, and VI; and (iii) the Second MSJ is denied as to Counts II and IV.

_____
UNITED STATES DISTRICT JUDGE

*Counsel:*

David L. Dotson
Law Office of David L. Dotson
Socorro, New Mexico

      *Attorney for the Plaintiff*

Kerri Lee Allensworth
Meena H. Allen
Allen Law Firm, LLC
Albuquerque, New Mexico

      *Attorneys for the Defendant*